AO 91 (Rev. 11/11) Criminal Complaint

AUSA Renato Mariotti (312) 886-7855

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

AUG 0 5 2015

AUG 5 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

HENRY SMILIE

CASE NUMBER:
**UNDER SEAL**

**15 CR 469**

**MAGISTRATE JUDGE MARTIN**

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about July 2012 to on or about May 27, 2014, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1347 | knowingly and willfully participating in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain, by means of materially false and fraudulent representations, money under the control of Medicare in connection with the delivery of or payment for health care services, and, in execution of the scheme, on or about January 2, 2013, did knowingly cause to be submitted a false claim, specifically, a claim that care plan oversight services were provided even though services provided did not qualify for payment by a federal health care medical benefit program. |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

_____
RAUL A. SESE
Special Agent, U.S. Department of Health and
Human Services, Office of Inspector General

Sworn to before me and signed in my presence.

Date: August 5, 2015

_____
*Judge's signature*

City and state: Chicago, Illinois

DANIEL G. MARTIN, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT    )
                                       )
NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, Raul A. Sese, being duly sworn, state as follows:

1.    I am a Special Agent with the U.S. Department of Health and Human Services. I have been so employed since approximately June 2007.

2.    As part of my duties as U.S. Department of Health and Human Services Special Agent, I investigate violations relating to federal criminal laws, including various health care fraud prohibitions. Through my experience and training, I am familiar with the applicable laws and regulations governing the Medicare health insurance program, and with various types of schemes to defraud the Medicare program. I have participated in the execution of multiple federal search warrants.

3.    This affidavit is submitted in part for the limited purpose of establishing probable cause to support a criminal complaint charging that beginning no later than July 2012 and continuing until at least May 27, 2014, HENRY SMILIE knowingly and willfully participated in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain, by means of false and fraudulent representations, money under the control of Medicare in connection with the delivery of or payment for health care services, and, in execution of the scheme, on or about January 2, 2013, did knowingly cause to be submitted a false claim,

1

specifically, a claim that care plan oversight services were provided even though the services provided did not qualify for payment by a federal health care medical benefit program, in violation of Title 18, United States Code, Section 1347.

4.     This affidavit is further submitted in support of applications for search warrants for the following locations, described more fully in Attachment A:

a) **Subject Premises 1**: LINCOLN PARK HOME HEALTH CARE, INC., 6160 N Cicero Avenue, Suite 330, Chicago, Illinois;

b) **Subject Premises 2**:  HOME PHYSICIAN SERVICES LLC., 621 S Roselle Road, Second Floor, Schaumburg, Illinois; and

c) **Subject Premises 3**: HOME PHYSICIAN SERVICES LLC, 6002 N Keating Avenue, Second Floor, Chicago, Illinois.

5.     Collectively, these three locations shall henceforth be referred to as the "**Subject Premises**."  This affidavit is made in support of an application for a warrant to search the "**Subject Premises**" for evidence and instrumentalities described further in Attachment B, concerning health care fraud offenses, in violation of Title 18, United States Code, Sections 1347. The statements in this affidavit are based on my personal knowledge, my review of documents and records, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purposes set forth above, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I

2

believe are sufficient to establish probable cause to believe that HENRY SMILIE has violated Title 18, United States Code, Section 1347 and that evidence and instrumentalities of violations of Title 18, United States Code, Sections 1347, are located at the **Subject Premises**.

6.     At times in this affidavit, I have included my understanding and interpretation of certain recorded conversations.     My understanding and interpretation of recorded conversations set forth in this affidavit are based on my knowledge of the investigation to date and review of consensually recorded conversations, the content and context of the conversations, prior and subsequent conversations, information provided by a cooperating human source, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations. The summaries of the conversations do not include all potentially criminal conversations recorded during the investigation, or all statements or topics covered during the course of the recorded conversations.

## Overview of the Scheme

7.     As discussed in more detail below, HOME PHYSICIAN SERVICES LLC is a home visiting physician company.   LINCOLN PARK HOME HEALTH CARE, INC. has used physicians from HOME PHYSICIAN SERVICES to certify patients as "confined to the home" so that Medicare can be billed for home health services provided to those patients.   From February 23, 2012 to July 15, 2014,

3

HOME PHYISICIAN SERVICES was paid over $1.2 million by Medicare for Care Plan Oversight, a billing code that indicates a doctor supervised the medical care of a home health patient, as described in more detail below.

8.     An individual who worked for HOME PHYSICIAN SERVICES—later identified in this affidavit as Individual F—told agents that he documented Care Plan Oversight activities for HOME PHYSICIAN SERVICES. Agents recovered an email between HENRY SMILIE, the Chief Executive Officer of HOME PHYSICIAN SERVICES, and Individual F. In the email, SMILIE discussed Medicare's regulations regarding Care Plan Oversight.

9.     Individual F told agents that, on a Friday or Saturday in January 2013, he confronted SMILIE regarding activities that Individual F believed were illegal. Individual F refused to continue working on activities other than Care Plan Oversight documentation. According to Individual F, SMILIE laughed in response, and said that HOME PHYSICIAN SERVICES's Care Plan Oversight activities were also illegal.

10.     Additionally, a doctor who was employed by HOME PHYSICIAN SERVICES—later identified in this affidavit as Doctor 5—told agents that he rarely performed Care Plan Oversight services and that, even if he did, it was not documented in the patient chart. Doctor 5 told agents that no one at HOME PHYSICIAN SERVICES discussed Care Plan Oversight services with him.

4

11.     Nonetheless, Medicare claims data indicate that a billing number for Doctor 5 was used to bill Medicare for approximately $60,000 in Care Plan Oversight claims from approximately January 2013 through approximately July 2014. One of those claims was billed on or about January 2, 2013, during the same month that Individual F confronted SMILIE. Medicare did not pay that claim.

### Medicare Background

7.     Based on my training and experience, I am aware of the following aspects of Medicare.

8.     The Medicare Program is a federally-funded health insurance program that provides health care benefits to certain individuals, primarily individuals who are over the age of 65 or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency within the Department of Health and Human Services.

9.     Medicare includes coverage under two primary components, Part A and Part B. This investigation relates to home health care, such as skilled nursing and physical therapy services, covered under Medicare Part A; and physician services covered under Medicare Part B.

10.     CMS contracts with public and private organizations, usually health insurance carriers, to process Medicare claims and perform administrative functions. In Illinois, CMS currently contracts with Palmetto GBA and National Government Services to administer and pay claims from the Medicare Trust Fund.

The Medicare Trust Fund is a reserve of monies provided by the federal government. Medicare provides free or below-cost health care benefits to certain eligible beneficiaries, primarily persons who are 65 years of age and older.

11.     Enrolled providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare.

12.     Medicare Part A provides coverage for certain in-home care provided to beneficiaries suffering from an illness or disability. Home health care includes part-time or intermittent skilled nursing care, as well as other skilled services such as physical therapy.

13.     Medicare Part A coverage requires beneficiaries to meet certain eligibility criteria, and the services must be reasonable and necessary. Under Medicare Part A, a patient is eligible for coverage if a patient is "confined to the home." A patient is confined to the home when an illness or injury restricts his ability to leave his place of residence except with the aid of supporting devices or if he has a condition which is such that leaving his home is medically contraindicated.

14.     In addition, for a patient to receive home health services from a home health agency, Medicare requires certification by a physician of the patient's need. The patient must be confined to his or her home, the services must be medically

6

necessary, the patient must need skilled medical services, the patient must be under the care of a physician, and a physician must certify that the patient meets these requirements. To certify a patient as confined to the home, the physician must sign a form entitled, "Home Health Certification and Plan of Care," which is sometimes referred to as a "Form 485."

15. Medicare's Home Health Care Program operates as described further below:

a. A service must be rendered by the claimant-home health care provider to the patient before a claim is made for reimbursement for a home health service;

b. Prior to submitting a claim, the claimant-home health care provider must assess the patient and complete an Outcome and Assessment Information Set ("OASIS") form in order to identify if the patient is confined to the home, the severity of symptoms, and the reimbursement rate to the home health care provider;

c. The OASIS form contains an Activities of Daily Living section that is completed by a nurse during a patient's initial assessment. The Activities of Daily Living section includes information about whether or not a patient needed assistance or could do certain activities independently such as combing hair, shaving, dressing oneself, using the bathroom, shopping and other activities;

d.    The OASIS form also contains a Nurse's Assessment section. In this section, the examining nurse assesses the patient's condition based upon her examination, observations, and discussions with the patient;

e.    The OASIS form is used to collect information on home health patient status and selected services. The Medicare Conditions of Participation for Home Health Agencies require agencies to collect the OASIS data set as part of their comprehensive patient assessment for all adult, non-maternity Medicare/Medicaid patients receiving skilled services;

f.    Home health care providers are required to enter the information collected from the OASIS forms into a software program available from CMS or software that conforms to CMS standard electronic record layout;

g.    The software program will identify the rate of reimbursement for a patient for a 60-day period episode of home health care. After services have been rendered, the claimant-home health care provider submits a Request for Anticipated Payment ("RAP") claim for services using the reimbursement rate identified from the OASIS form;

h.    Medicare processes the RAP claim and generally pays 60% of the identified reimbursement rate to the claimant-home health care provider. After the 60-day episode is completed, the provider will notify the claims contractor, which in this region is Palmetto GBA, and Palmetto GBA will reimburse the remaining 40% payment to the claimant-home health care provider, subject to a

8

determination of the particular care that was actually provided. Medicare makes payments for claims by check or wire (electronic funds transfer-EFT) to the claimant-home health care provider or his/her designee; and

       i.    The rate of reimbursement to the provider depends on the severity of the symptoms, a patient's daily living activities, and diagnosis collected from the OASIS form.

     16.    The program requires that a claimant-home health care provider (also known as a "home health agency") actually render the services for which the provider submits a claim. To be paid for services rendered, a provider must submit a claim for payment containing certain required information pertaining to the patient, including the type of services provided, the procedure code, the date and price of such services, and a certification that such services were personally rendered by the provider.

     17.    Medicare typically approves home health care for a 60-day period of time. The 60-day periods are referred to as cycles. The first day of the initial cycle of home health care is known as a Start of Care. After the Start of Care, a patient must be "recertified" by a physician to receive additional 60-day cycles of home health care. These new cycles are known as "recertifications."

     18.    As noted above, Medicare Part A governs reimbursement for home health care. Medicare Part B provides supplementary medical insurance for physician services, including certain home health and preventive services. Enrolled

9

providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services. CMS contracts with National Government Services to administer and pay Part B claims from the Medicare Trust Fund submitted for physicians' services in multiple states, including Illinois.

19.    As of March 2011, before a patient can be certified as eligible to receive home health care, the patient must be seen face to face by a physician or other qualified practitioner. The physician certifying the patient for home health care must document the face-to-face encounter and sign the certification.

### Components of Home Health Care Service

20.    Based on my training and experience, I am aware of the following aspects of home health care services and the way such services are provided.

21.    Home health care services themselves—such as skilled nursing and physical therapy, as described above—are provided by a home health care company. Records relating to those services, such as the notes from nursing or physical therapy visits provided in patients' homes, are typically maintained by the home health care company.

22.    However, in order for home health care services to be provided, a doctor must order the service. The doctors who order such services typically are not employed by the home health care company. Rather, they are employed by a separate clinic or doctors' practice. As a result, the records of services provided by

doctors in connection with home health care—such as records of a doctor's visits to patients in their homes—are typically maintained at the doctor's clinic.

## Care Plan Oversight

23.     Chapter 15 of the Medicare Benefit Policy Manual describes, among other things, care plan oversight ("CPO") services. The items related to CPO and home health services are excerpted below:

a.      Care Plan Oversight is supervision of patients under care of home health agencies [HHA] or hospices that require complex and multidisciplinary care modalities involving regular physician development and/or revision of care plans, review of subsequent reports of patient status, review of laboratory and other studies, communication with other health professionals not employed in the same practice who are involved in the patient's care, integration of new information into the care plan, and/or adjustment of medical therapy.

b.      Per the Medicare Benefit Policy Manual, these services are covered only if all the following requirements are met:

1.      The beneficiary must require complex or multi-disciplinary care modalities requiring ongoing physician involvement in the patient's plan of care;

2.      The Care Plan Oversight (CPO) services should be furnished during the period in which the beneficiary was receiving Medicare covered HHA or hospice services;

3.      The physician who bills CPO must be the same physician who signed the home health or hospice plan of care;

4.      The physician furnished at least 30 minutes of care plan oversight within the calendar month for which payment is claimed. Time spent by a physician's nurse or the time spent consulting with one's nurse is not countable toward the 30-minute threshold. Low-intensity services included as part of other evaluation and management services are not included as part of the 30 minutes required for coverage;

11

5. The work included in hospital discharge day management (codes 99238-99239) and discharge from observation (code 99217) is not countable toward the 30 minutes per month required for work on the same day as discharge but only for those services separately documented as occurring after the patient is actually physically discharged from the hospital.

6. The physician provided a covered physician service that required a face-to-face encounter with the beneficiary within the 6 months immediately preceding the first care plan oversight service. Only evaluation and management services are acceptable prerequisite face-to-face encounters for CPO. EKG, lab, and surgical services are not sufficient face-to-face services for CPO;

7. The care plan oversight billed by the physician was not routine post-operative care provided in the global surgical period of a surgical procedure billed by the physician;

8. If the beneficiary is receiving home health agency services, the physician did not have a significant financial or contractual interest in the home health agency. A physician who is an employee of a hospice, including a volunteer medical director, should not bill CPO services. Payment for the services of a physician employed by the hospice is included in the payment to the hospice;

9. The physician who bills the care plan oversight services is the physician who furnished them;

10. Services provided incident to a physician's service do not qualify as CPO and do not count toward the 30-minute requirement;

11. The physician is not billing for the Medicare end stage renal disease (ESRD) capitation payment for the same beneficiary during the same month; and

12. The physician billing for CPO must document in the patient's record the services furnished and the date and length of time associated with those services.

## Ownership And Control Of The Health Care Companies

24.     The companies at issue in this affidavit are LINCOLN PARK HOME HEALTH CARE, INC.; PRO VITA HOME CARE, LLC; and HOME PHYSICIAN SERVICES LLC.

25.     Law enforcement agents have conducted a review of corporate records maintained by the Illinois Secretary of State, Medicare enrollment applications, and updates to the enrollment applications to identify who owns and controls these entities

## LINCOLN PARK HOME HEALTH CARE, INC.

26.     According to Medicare Provider Enrollment records, LINCOLN PARK is a home health agency located at **Subject Premises 1**. Illinois Secretary of State records identify Individual A as the administrator of LINCOLN PARK.

27.     According to Medicare Provider Enrollment records, LINCOLN PARK has been enrolled in Medicare since February 6, 2009, and was assigned a provider number, under which it submits claims to the Medicare program for reimbursement from federal funds. On August 1, 2013, LINCOLN PARK submitted an updated Medicare enrollment application to allow it to continue to operate as a Medicare provider. According to the updated application, LINCOLN PARK maintains its financial and medical records at its office at **Subject Premises 1**. The application identified Individual A as the president of LINCOLN PARK.

28.     Agents learned from representatives of Cahaba Safeguard Administrators, LLC, an entity that contracts with Medicare, that LINCOLN PARK

13

submits claims to Medicare electronically. Based on my training and experience, I am aware that before a company may submit claims electronically, it must execute an agreement with Medicare. As part of that agreement, the company is required to maintain the original medical records and other documentation relating to paid claims for a period of six years and three months after the claims are paid.

## PRO VITA HOME CARE, LLC.

29.     Prior to becoming owner of LINCOLN PARK, Individual A was one of the owners of PRO VITA HOME CARE, LLC. ("PRO VITA"). According to Medicare records, PRO VITA enrolled in Medicare on April 13, 2009 and was assigned a provider number, under which it submitted claims to Medicare for reimbursement from federal funds. The application identified several individuals with ownership interest of PRO VITA, including Individual A.

30.     According to the updated Medicare Provider Enrollment application dated August 1, 2010, PRO VITA maintained its financial and medical records at its office located at 7366 North Lincoln, Suite 300, Lincolnwood, Illinois ("Pro Vita Offices").

31.     According to representatives of TrustSolutions, LLC, an entity that contracted with Medicare, it received information that some Medicare beneficiaries had been solicited for the purpose of providing them with medically unnecessary services. TrustSolutions representatives also indicated that in 2010, it sent physician questionnaires to 45 physicians who referred patients to PRO VITA

within a data set generated from a statistically valid random sample. According to TrustSolutions records, 23 physicians responded, and seven of the physicians replied that either the noted beneficiary was not their patient or that they had not ordered home health services for the noted beneficiary.

32.    Records maintained by TrustSolutions state that it reviewed a sample of Medicare claims for home health services purportedly paid between January 1, 2010 and March 4, 2011. According to a summary prepared by TrustSolutions, TrustSolutions employees reviewed the medical records corresponding to 153 separate claims. Based on that review, TrustSolutions calculated a 95.8% denial rate, yielding an actual overpayment of $464,086.62. TrustSolutions then extrapolated that denial rate to all of the claims submitted by PRO VITA to Medicare, indicating a potential overpayment in the amount of $3,900,254.

33.    On May 31, 2013, CMS sent an overpayment letter to PRO VITA, notifying PRO VITA that they received a Medicare payment in error for the amount of $3,900,254 and were required to return the overpaid amount by June 29, 2013.

34.    In November 7, 2013, law enforcement conducted surveillance at Pro Vita Offices and discovered that the office had been cleared out.

## HOME PHYSICIAN SERVICES LLC

35.    Documents on file with the Illinois Secretary of State indicate that HOME PHYSICIAN SERVICES LLC was incorporated in December 2011.

36. According to its Medicare Enrollment application, HOME PHYSICIAN SERVICES was enrolled as a multispecialty clinic with Medicare. According to HOME PHYSICIAN SERVICES' Medicare Enrollment application, CMS accepted it into the Medicare program as of February 9, 2012.

37. HOME PHYSICIAN SERVICES submitted an updated Medicare enrollment application in November 2012 that identified HENRY SMILIE as the owner. In addition, the updated enrollment listed two address locations for HOME PHYSICIAN SERVICES—**Subject Premises 2** and **Subject Premises 3**.

38. There are two office locations listed on HOME PHYSICIAN SERVICES' website, which I accessed on July 28, 2015—**Subject Premises 2** and **Subject Premises 3**.

39. According to Medicare claims records billed by HOME PHYSICIAN SERVICES under its own National Provider Identifier, HOME PHYSICIAN SERVICES billed Medicare for approximately $3,917,680 in services from February 23, 2012 to July 15, 2014. This figure likely underrepresents the total amount billed by HOME PHYSICIAN SERVICES, because individual doctors associated with HOME PHYSICIAN SERVICES may have billed Medicare under their own National Provider Identifiers for work performed while they were associated with HOME PHYSICIAN SERVICES.

40. HOME PHYSICIAN SERVICES submitted claims to Medicare electronically. Based on my training and experience, I am aware that before a

16

company may submit claims electronically, it must execute an agreement with Medicare. As part of that agreement, the company is required to maintain the original medical records and other documentation relating to paid claims for a period of six years and three months after the claims are paid.

## PRO VITA Patients

41.     On November 6, 2013, agents interviewed Patient R.K., who was identified by Medicare records as a former patient of PRO VITA. Patient R.K. told agents that she received home health services from PRO VITA beginning in October 2010 and ending in April 2011. Patient R.K. said that during the entire time she received services from PRO VITA, she felt guilty because she was able to get up and get around. Patient R.K. told agents that she is capable of leaving her residence when she wants and uses public transportation to get around by herself. Patient R.K. explained to agents that when the PRO VITA nurse visited Patient R.K.'s home, the nurse sat on her couch and talked to Patient R.K. for about an hour; took her blood pressure; listened to Patient R.K.'s chest, and then left.

42.     Patient R.K. explained to agents that she agreed to receive home health services after being approached at her church club by an employee who described herself as working for PRO VITA (referred to herein as "Recruiter A").[1] According to Patient R.K., Recruiter A signed her up with PRO VITA.

---

[1] According to Illinois Department of Employment Security ("IDES") quarterly wage records, Recruiter A was employed by PRO VITA from at least the first quarter of 2010 through approximately the second quarter of 2013. The most recent available data

43.     Patient R.K. advised agents that she frequently sees Recruiter A at church functions and social gatherings. Patient R.K. told agents that in the fall of 2013, Recruiter A, at a church function, informed her that PRO VITA changed their name to LINCOLN PARK. According to Patient R.K., during this same function, Recruiter A asked her to sign up for home health services, but she declined. Patient R.K. told agents that Recruiter A provides small gifts through a raffle or provides food to attendees at the social gatherings that she has attended.

44.     A review of Medicare claims records indicates that PRO VITA submitted claims to Medicare for home health services purportedly provided to Patient R.K. from October 13, 2010 to April 6, 2011, and PRO VITA was paid approximately $11,174.84 for these claims.

45.     On November 6, 2013, agents interviewed another former patient of PRO VITA, Patient J.G. Patient J.G. informed agents that he received home health services from PRO VITA, and a review of Medicare claims records indicates that he received home health services from PRO VITA beginning in July 2011 and ending April 2012. Patient J.G. explained to agents that employees from PRO VITA showed up at his residence and did not do anything. Patient J.G. told agents that he recalled signing up for home health services at a luncheon that was held in his apartment building. Patient J.G. said that while he was receiving home health care

---

obtained from IDES for PRO VITA ended in the second quarter of 2013. According to IDES records, Recruiter A was employed with LINCOLN PARK during the third quarter of 2013.

services from PRO VITA, he was 100% healthy, but that PRO VITA forced home health care services upon him. According to Patient J.G., he leaves his house almost every day, and he advised agents that he is not confined to the home.

46.     A review of claims records indicates that PRO VITA submitted claims to Medicare for home health services purportedly provided to Patient J.G. from July 18, 2011 to April 19, 2012, and PRO VITA was paid approximately $7,959.86 for these claims.

### PRO VITA and LINCOLN PARK Patient

47.     On December 17, 2013, agents interviewed Patient H.G., who was identified by Medicare records as a former patient of PRO VITA. Patient H.G. informed agents that he received home health services from PRO VITA, and a review of Medicare claims records indicates that he received home health services from PRO VITA beginning in August 2010 and ending in August 2013. Patient H.G. told agents that PRO VITA and LINCOLN PARK merged companies in approximately the Fall of 2013. According to Patient H.G., the nurse who visited him weekly while he was receiving services from PRO VITA stopped making patient visits to him, because she began working in the office of LINCOLN PARK. According to Patient H.G., he currently receives services from LINCOLN PARK.

48.     Patient H.G. explained to agents that he stopped receiving home health services for approximately six months because he did not like how PRO VITA told him a doctor would be coming to visit between a three-hour window.

Patient H.G said that he did not like having a window for the doctor to come see him at home. Patient H.G. told agents that he explained to PRO VITA that he wanted to be able to leave his house because he had things to do. Patient H.G. told agents that he agreed to start home health care again because PRO VITA became more accurate with the timing of visits. Patient H.G. also told agents that he still works, running his own business. Patient H.G. also said that he still drives and remains active by exercising.

49. A review of claims records indicates that PRO VITA submitted claims to Medicare for home health services purportedly provided to Patient H.G. from August 5, 2010 to August 1, 2013, and PRO VITA was paid approximately $23,678.06 for these claims. A review of claims records indicates that LINCOLN PARK submitted claims to Medicare for home health services purportedly provided to Patient H.G. from August 13, 2013 to August 11, 2014, and LINCOLN PARK was paid approximately $11,394.75 for these claims.

50. The American Medical Association has established certain codes to identify medical services and procedures performed by physicians, which are collectively known as the Physicians' Current Procedural Terminology ("CPT") system. The CPT system provides a national correct coding practice for reporting services performed by physicians and for payment of Medicare claims. CPT codes are widely used and accepted by health care providers and insurers, including Medicare and other health care benefit programs.

51.    The American Medical Association has established CPT codes for home visits with new and established patients.  Since 1998, home visits with new patients are billed using CPT codes 99341 through 99345, and home visits with established patients are billed using CPT codes 99347 through 99350.

52.    A review of claims submitted to Medicare Part B reflects that claims were submitted by HOME PHYSICIAN SERVICES for services purportedly provided by two rendering physicians, Doctor 1 and Doctor 2, who certified or re-certified patient Patient H.G. for home health services.  These providers are both listed as being rendering physicians from HOME PHYSICIAN SERVICES.   In addition, a review of Medicare claims submitted by HOME PHYSICIAN SERVICES reveals that they were paid a total of approximately $979.31 for services provided to Patient H.G. during December 2012 until December 2013.

53.    According to records submitted to Medicare by HOME PHYSICIAN SERVICES, Medicare was billed for a certification for home health provided to Patient H.G. by Doctor 1 and a recertification for home health by Doctor 2.[2]  Of the total amount billed to Medicare for Patient H.G. during this time frame, the majority that was paid—approximately $804.19—was for CPT code G0181, Care

---

[2] According to Medicare enrollment records, Doctor 1 became a member of the practice group and agreed to reassign Doctor 1's benefits to HOME PHYSICIAN SERVICES in approximately September 2012.   According to Medicare enrollment records, Doctor 2 became a member of the practice group and agreed to reassign Doctor 2's benefits to HOME PHYSICIAN SERVICES in approximately May 2012.

Plan Oversight. According to the American Medical Association, CPT code G0181 is to be used under the following conditions:

> Physician supervision of a patient receiving Medicare-covered services provided by a participating home health agency (patient not present) requiring complex and multidisciplinary care modalities involving regular physician development and/ or revision of care plans, review of subsequent reports of patient status, review of laboratory and other studies, communication (including telephone calls) with other health care professionals involved in the patient's care, integration of new information into the medical treatment plan and/or adjustment of medical therapy, within a calendar month, 30 minutes or more.

54.     In addition to Medicare claims submitted under HOME PHYSICIAN SERVICES' group number, after December 2013, Medicare Part B claims for the physicians who purportedly visited Patient H.G. were billed under the physicians' National Provider Identifiers ("NPI"). These physicians were identified as working for HOME PHYSICIAN SERVICES by agents based upon a review of the physicians' enrollment information.

55.     Medicare records for Part B claims billed under HOME PHYSICIAN SERVICES revealed that from approximately January 2014 through August 2014, Doctor 1 and Doctor 2 were paid approximately $979.31 for services purportedly provided to Patient H.G. According to Medicare records, during this time period, CPT codes that were billed included G0181 and established patient home visit codes such as 99348 and 99349.

## HOME PHYSICIAN SERVICES Patient

22

56.     On January 17, 2014, agents interviewed a former patient of HOME PHYSICIAN SERVICES, Patient K.D.  Patient K.D. explained that she agreed to receive visiting physicians' services after being approached by Recruiter A at her church.  According to Patient K.D., Recruiter A convinced Patient K.D. to get services.  Patient K.D. told agents that she agreed to sign up for services because she was scheduled to get rotator cuff surgery, and she wanted someone to assist her husband while she healed from her surgery.  According to Patient K.D., she provided Recruiter A her personal information to get signed up.  Patient K.D. also told agents that she had her rotator cuff surgery in January 2013.

57.     Patient K.D. told agents she was visited by a physician, Doctor 3, from HOME PHYSICIAN SERVICES in April 2013.[3]  According to Patient K.D., during the visit, she advised Doctor 3 that she would not be replacing her primary care physician with Doctor 3 and that Patient K.D.'s only interest in home care was solely to get somebody to help Patient K.D. with her husband while she healed from her surgery.

58.     Patient K.D. told agents that after Doctor 3's visit, Patient K.D. decided that she did not want the services being provided to her by Doctor 3, so Patient K.D. called HOME PHYSICIAN SERVICES to cancel services.

---

[3] According to Medicare enrollment records, Doctor 3 became an associate of HOME PHYSICIAN SERVICES and agreed to reassign Doctor 3's benefits to HOME PHYSICIAN SERVICES in approximately July 2012.

59.    A review of Medicare claims records indicates that HOME PHYSICIAN SERVICES submitted claims to Medicare for services purportedly provided to Patient K.D. from April 4, 2013 to September 4, 2013.    HOME PHYSICIAN SERVICES was paid approximately $642.62 for these claims.

60.    Patient K.D. told agents that she reviewed her Medicare benefits statement and realized HOME PHYSICIAN SERVICES billed for more than just Doctor 3's visit.    Patient K.D. showed her Medicare benefits statements to the agents during an interview on January 17, 2014.

61.    A review of Medicare claims submitted for care purportedly provided to Patient K.D. indicates that HOME PHYSICAN SERVICES billed a patient visit under CPT code 99343 performed on April 4, 2013.    Additionally, HOME PHYSICIAN SERVICES billed CPT code G0181 (Care Plan Oversight) on six different occasions, and each time was paid approximately $88.95 for G0181.

62.    According to the Medicare Benefit Policy Manual, a requirement for Care Plan Oversight services to be covered by Medicare is that the patient also must be receiving home health services.    According to Medicare billings, Patient K.D. was not certified by Doctor 3 for home health services nor did Patient K.D. receive home health services from any home health agency during this time frame.

**LINCOLN PARK Patients**

63.    On May 8, 2014 and August 28, 2014, agents interviewed a former patient of LINCOLN PARK, Patient A.B.    Patient A.B. told agents that he was

receiving home health services from LINCOLN PARK. According to Medicare records, Patient A.B. has received care from LINCOLN PARK since August 2013.

64.     Patient A.B. told agents that he sees his primary care physician every six months at his office. In addition, he receives skilled nursing care once a week from LINCOLN PARK, and physicians have visited him at his home. Patient A.B. explained to agents that he leaves his house a lot because he is very active with his church, and Patient A.B. told agents that he still drives. Patient A.B. explained to agents that his physical condition and health have remained constant since he began receiving home health services.

65.     A review of Medicare claims records indicates that LINCOLN PARK submitted claims to Medicare for services purportedly provided to Patient A.B. from August 14, 2013 to June 21, 2014, and LINCOLN PARK was paid approximately $13,084.52 for these claims.

66.     On August 29, 2014, agents interviewed a patient of LINCOLN PARK, Patient L.B., who is also Patient A.B.'s wife. Patient L.B. told agents that she has been receiving home health services from LINCOLN PARK. According to Medicare billing records, Patient L.B. has been receiving care from LINCOLN PARK since August 2013.

67.     Patient L.B. also told agents that she sees her primary care physician, the same one she has seen for the past five years. In addition, Patient L.B. said that she receives skilled nursing care once a week from LINCOLN PARK and

physicians have visited her at the home. In addition, Patient L.B. advised agents that she received physical therapy through LINCOLN PARK for a few months. Patient L.B. explained to agents that she leaves her house to run errands, visit friends, and go to her primary care physician's office. Patient L.B. also said that she still drives.

68.    A review of Medicare claims records indicates that LINCOLN PARK submitted claims to Medicare for home health services purportedly provided to Patient L.B. from August 13, 2013 to June 8, 2014, and LINCOLN PARK was paid approximately $9,134.90 for these claims. Medicare records indicate that this total included physical therapy and skilled nurse care purportedly provided to Patient L.B.

### Use of Undercover Beneficiary

69.    As described below, the investigation involved a healthy non-home bound individual purportedly covered by Medicare seeking home health and physician services who acted in an undercover capacity as a confidential human source (referred to as CHS).[4] During the course of the investigation, the CHS fraudulently received home health services from a subject home health company, and was fraudulently certified as "confined to the home" by HOME PHYSICIAN

---

[4] The CHS was paid a total of $660 by law enforcement for his work on this case, and was previously paid $1,000 for his work on another investigation. Agents have been reimbursed for approximately $225.82 in expenses related to the operation of the CHS.

SERVICES.[5]  Agents instructed the CHS to answer any questions posed to him by health care providers honestly, and to refrain from altering his appearance, behavior, or mannerisms during visits with health care providers.

70.     CHS was an able-bodied 71-year-old man who moved and walked without difficulty and who was not confined to his home.  Based upon a review of the video recordings described below, as well as conversations with CHS, during CHS's interactions with others, as described below in this affidavit, he did not use a wheelchair, walker, or other movement aid, nor did CHS use any other medical device that would indicate to medical personnel discussed below that he was ill or confined to the home.

### Interactions with Recruiter A

71.     Medicare records indicate that, in connection with the undercover operation, LINCOLN PARK and HOME PHYSICIAN SERVICES submitted fraudulent claims to Medicare for care purported to have been provided to the CHS and, as a result, Medicare paid LINCOLN PARK approximately $4,619.94 and paid physicians from HOME PHYSICIAN SERVICES approximately $648.25.

72.     On or about November 18, 2013, at approximately 3:10 p.m., under the direction of agents, the CHS placed a consensually recorded call to LINCOLN PARK

---

[5] As a part of the undercover investigation, law enforcement obtained a unique undercover Medicare number for the CHS.  Through the use of these unique Medicare numbers, law enforcement has the ability to track Part A and B claims submitted by LINCOLN PARK and HOME PHYSICIAN SERVICES to Medicare for care purportedly provided to the CHS.

and requested to speak with Recruiter A, the individual previously identified by Patient R.K. during an interview with agents as an individual who asked her to sign up for home health services with LINCOLN PARK.

73.     During the November 18, 2013 call, an unidentified woman answered the phone and identified herself as "LINCOLN PARK."[6]  CHS said that he had been to brunch with friends and that they told CHS about LINCOLN PARK, PRO VITA, and "a woman named [Recruiter A] who does presentations." The unidentified female stated, "[Recruiter A] is one of our marketers."  CHS then asked when one of Recruiter A's next presentations will be, so that CHS might be able to attend because CHS is "kind of interested."  The woman asked CHS what building he lives in. CHS advised that he is in the northern suburbs.  The unidentified woman said that, "She [Recruiter A] does, uhm, you know, regular marketing at, uhm, certain buildings. That's wha-, that's how they know her."  CHS again advised that he wanted to attend one of Recruiter A's presentations, and the woman said that she would call Recruiter A and find out from her when Recruiter A's next presentation would be. CHS provided his phone number and name. The woman said that she would call Recruiter A, and Recruiter A would give CHS a call back.

74.     CHS advised agents on or about November 18, 2013 that he received a call from Recruiter A earlier that day.  According to CHS, he did not cause this call

_____

[6] All quotations contained in this affidavit were taken from a review of the audio recordings made by the CHS, and are not intended to be a verbatim transcript.

to be recorded because he did not recognize the phone number of the incoming caller. CHS told agents that Recruiter A identified herself by her first and last name during the call.[7] CHS also told agents that Recruiter A told him that in order to sign CHS up for home health services, she needed to ask him five questions and get his Medicare number. According to CHS, he did not provide a Medicare number to Recruiter A.

75. On or about November 22, 2013, at approximately 3:13 p.m., under the direction of agents, the CHS placed a consensually recorded call to Recruiter A. CHS asked, "Hello, is this [Recruiter A]?" Recruiter A answered, "Yes." Recruiter A said that she had "called to see if you were still interested in home health care." CHS replied, "Yeah, I was wondering whether you could e-mail when I can come to one of your presentations after Thanksgiving." Recruiter A asked CHS where he lives, so that she could invite CHS to a presentation that is close to CHS's home. CHS said that is what he would like to do. CHS said that he lived near a particular Chicago suburb and Recruiter A said that she would be in that area this week. CHS said that he needed to get his house in order for Thanksgiving. CHS also advised that he does not give out information over the phone. Recruiter A advised that she would call after Thanksgiving to set up an appointment at CHS's home.

76. On or about December 10, 2013, at approximately 4:18 p.m., under the direction of agents, the CHS placed a consensually recorded call to LINCOLN PARK

---

[7] This was the same first and last name provided by Recruiter A to Patient R.K.

and requested to speak with Recruiter A. The recording indicates, CHS left a voicemail for Recruiter A to call him.

77.     On or about December 10, 2013, CHS advised agents that he received a call from Recruiter A but did not pick up the phone or speak to Recruiter A. Later that day, on or about December 10, 2013, at approximately 5:01 p.m., under the direction of agents, the CHS placed a consensually recorded call to Recruiter A. CHS inquired when Recruiter A's next presentations would take place. Recruiter A advised CHS she could meet anywhere by CHS's residence on Thursday the 19th because she would be in seeing a patient nearby. Recruiter A suggested, "On Friday the 20th, I could stop by and see you." CHS responded, "Okay, I will be out and about that day, but I could meet you at [a particular restaurant]." CHS and Recruiter A agreed to meet at noon on December 20, 2013 at a restaurant in Skokie, Illinois. In addition, CHS told Recruiter A what he would be wearing and said that he would be in the waiting area of the restaurant.

78.     On or about December 20, 2013, for approximately 30 minutes, CHS had a consensually audio and video recorded meeting with Recruiter A at a restaurant in Skokie, Illinois. Based upon a review of the video recording, during the meeting, Recruiter A was able to observe CHS walk unassisted from the waiting area of the restaurant to a table in the dining area.

79.     The recording indicates that Recruiter A discussed the services LINCOLN PARK could provide to CHS. When explaining the services provided by

30

LINCOLN PARK, Recruiter A told CHS, "Everything is paid for through Medicare." The recording indicates that Recruiter A explained that a nurse visits once a week and the nurse visit is scheduled at the patient's convenience. CHS responded, "Oh good, because I'm very, very active in Basenji Rescue, which is a dog rescue thing. And from time to time, I've gotta go out on transports or, you know, bring dogs to other places and stuff like that. And uh, then sometimes I've gotta go out, if my daughter-in-law's got a Doctor's appointment I have to go, one lives in Zion, one lives in Streamwood, so I gotta go watch the grandkids."

80.     The recording indicates that Recruiter A described benefits that CHS, as a senior citizen, was eligible to receive. In the recording, Recruiter A acknowledged that CHS still drives, however Recruiter A also warned CHS "okay, cuz, Medicare will not cover anybody at home if they're driving." The recording indicates that Recruiter A talked about getting CHS set up with public transportation. Recruiter A said, "Now, the day that you don't want to drive no more, we would give you the PACE application anyway, and then you keep it for whenever you decide you don't wanna drive no more, then you could apply for it."

81.     On or about March 7, 2014, at approximately 4:17 p.m., CHS made a consensually recorded telephone call to Recruiter A at the direction of agents. The recording indicates that CHS told Recruiter A that he wanted to sign up for home health services at LINCOLN PARK. In the recording, Recruiter A discussed how best to establish CHS as a home health care candidate who could be eligible for

home health care services. Recruiter A stated, "When the Doctor and the nurse come and put you in the program, [CHS], between me and you, do not say that you occasionally drive. All right? 'Cuz if not, they will not approve you. All right?" CHS responded, "Okay. Do not say what?" Recruiter A said, "Do not say that you occasionally drive." CHS responded, "Okay." Recruiter A then said, "Okay. Because if not, Medicare laws – They will not approve you. All right?" CHS responded, "Okay."

82. In the recording, Recruiter A further explained how CHS should act when the nurse and physician visit. Recruiter A said, "I'm gonna give you a tip. Okay? When the social worker from the Department of Aging calls you to come and interview you at the house . . ." CHS responded, "Okay." Recruiter A continued, "They will give you a date and a time. Please stay in your pajamas. Also, when the doctor and the nurse come and see you. Okay?" In the recording Recruiter A asked CHS, "Do you use a cane of any sort? Or a walker for now?" CHS responded, "Every once and in a while I'll use my cane." Marketer A responded, "Ok let me put that down, uses a cane once in a while. All right. When they come to see you, the doctor and the nurse, make sure you use it, okay, in front of them. All right?" CHS responded, "Okay."

83. After Recruiter A met with CHS, LINCOLN PARK purported to provide home health care services to CHS between approximately March 2014 and June 2014, as further described below. Before CHS met with representatives of

LINCOLN PARK, agents instructed him not to follow the directions given by Recruiter A, to answer any questions posed to him by health care providers honestly, and to refrain from altering his appearance, behavior, or mannerisms during visits with health care providers.

84.     On or about March 7, 2014, at approximately 5:13 p.m., CHS made a consensually recorded telephone call to Recruiter A at the direction of agents. According to the recording, CHS asked Marketer A, "Did you call me?" Marketer A responded, "Yes, I did, hon." CHS responded, "Oh cuz my..." Marketer A said, "I called you to tell you that everything came out approved." The recording indicates that at the end of the call, Marketer A told CHS, "Okay my dear, so they should be calling you to do uh, appointments."

85.     At the direction of agents, CHS placed a consensually recorded phone call to Recruiter A on March 10, 2014 at approximately 12:21 p.m. The recording indicates that Recruiter A informed CHS that he needed to schedule an appointment with both a nurse and a doctor. According to the recording, Recruiter A told CHS, "They're all calling me looking for you. Yeah the doctor, the nurse, everybody." CHS responded, "Yeah, that Home Physician Service is trying to call me..." Recruiter A responded, "What do I tell them, 'cuz they, they all wanna know when they could come and see you." CHS responded, "Okay, now a doctor has a nurse by the name of ..." Recruiter A responded, "[Nurse A] ... Yeah he called this morning to try to go see you, to open your, to put you in the program ... You want

33

him to come this Friday?" CHS responded, "Yes, this Friday, March 14th." Recruiter A also asked, "Now I just had the doctor's office call me also looking for you. What time could I tell them?" CHS said, "Well I'll call there. Is that Home Physician Services?" Recruiter A responded, "Yes that's the Home Physician Service." According to the recording, at the end of the call Recruiter A told CHS she would call the "agency," which I understand to refer to LINCOLN PARK HOME HEALTH, to tell them CHS would be setting up an appointment to see one of the nurses.

86.     At the direction of agents, CHS placed a consensually recorded phone call to the number provided by Nurse A on March 10, 2014 at approximately 12:50 p.m. The recording indicates that during the call, Nurse A provided his first name, which is the same first name provided by Recruiter A. According to the recording, CHS agreed to be visited by Nurse A at noon on March 14, 2014.

### Nurse A's Visit

87.     On or about March 14, 2014, at approximately 11:43 a.m., CHS had a consensually audio and video recorded meeting with a nurse employed by LINCOLN PARK at CHS's residence. According to the recording, the nurse identified himself by his first name. The nurse was later identified by agents by comparing the nurse's first name to IDES records for LINCOLN PARK, which revealed only one nurse with that first name employed by LINCOLN PARK, and is

referred to herein as Nurse A.[8]  Based upon a review of the video recordings, at the beginning of the meeting, CHS answered the door by walking to the door without assistance and let Nurse A into his residence.

88.    Nurse A asked, "Have any episodes of shortness of breath?"  CHS answered, "Uh, yeah, if I come up the basement stairs pretty quick, I'll—you know, get winded and stuff like that."  Nurse A asked, "How about the uh, with uh, walking. Any problems with walking?"  CHS responded, "Uh, well, I have spinal stenosis.  So if I stand too long, my legs start to go numb.  But you know, as far as going grocery shopping, (UI) that's no problem."

89.    Nurse A stated, "When was the last time uh, you saw the Doctor?" CHS said, "Uh, probably about eight months ago.  Usually I go once a year for a physical."

90.    Nurse A asked, "Can you do your showers yourself?  CHS responded, "Oh yeah. That's no problem."  Nurse A asked, "Able to get out of the tub and the like...  CHS responded, "Yeah, no problem doing that."

91.    According to the recording, Nurse A asked, "How about for the days of visits?  When is the best time I can see you always?  It's only a once a week visit." CHS responded, "Yeah once a week. Probably Thursdays, cause there's some

---

[8] Records from IDES reflect that Nurse A began working for LINCOLN PARK no later than the first quarter of 2011.  According to IDES records for PRO VITA Nurse A was employed there until the second quarter of 2013.  A search of the Illinois Department of Financial and Professional Regulation revealed that Nurse A is a licensed nurse in Illinois.

Wednesdays I'm busy and then, Fridays sometimes I go visit a friend of mine at a home health care." In addition, CHS told Nurse A, "Just then make sure you give me a call before you come, so in case something comes up and I'm not here."

92. Based upon a review of the video recording, at the end of the meeting, CHS escorted Nurse A to the door, walking without assistance. This meeting lasted approximately 25 minutes.

### Doctor 2's Visit

93. On or about March 20, 2014, at approximately 10 a.m., CHS had a consensually audio and video recorded meeting with a doctor. The doctor introduced himself as Doctor 2 upon entering the residence. According to Medicare enrollment records, Doctor 2 became a member of the practice group and agreed to reassign Doctor 2's benefits to HOME PHYSICIAN SERVICES in approximately April 2012.

94. The meeting occurred at CHS's residence, where the CHS lived with four dogs. The video recording depicts the CHS standing on his own and walking towards the door when Doctor 2 arrived. The audio on the recording indicates that CHS went to the door, where CHS's dogs were barking. The audio recording indicates that Doctor 2 advised that he feared being bitten. CHS replied that he would take the dogs outside. The audio recording indicates that CHS told Doctor 2 that the dogs were outside and returned to the door. The video recording indicates that Doctor 2 and his Medical Assistant entered CHS's purported residence.

95.     The audio recording indicates that Doctor 2, after identifying himself, requested a list of medicines the CHS takes. CHS responded, "Advair and Jalyn."[9] Doctor 2 then asked if CHS had diabetes or high blood pressure. CHS stated, "No, no," to which Doctor 2 responded, "So what is your medical diagnoses? Anything?" CHS advised, "No. Just, I got sleep apnea."

96.     According to the audio recording, CHS informed Doctor 2 that CHS wished that Doctor 2 would have called first. Doctor 2 asked, "My office didn't call you?" CHS responded, "Nope. I wish you would call from now on because I may not be home." CHS then informed Doctor 2 that CHS had gall bladder surgery a couple years ago, and that CHS had neck surgery about 15 years ago to treat a herniated disk.

97.     The audio recording indicates that the unidentified Medical Assistant asked CHS if CHS was allergic to any medications.[10] CHS responded that CHS had broken out in a rash a couple of years ago after taking a particular antibiotic that CHS could not identify. Doctor 2 then asked if CHS smokes. CHS responded, "I smoke a pipe." CHS advised that CHS did not use drugs or alcohol.

---

[9] Jalyn, according to the GlaxoSmithKline web site, is a prescription medicine used to treat benign prostatic hyperplasia (BPH) in men with an enlarged prostate. Advair, according to GlaxoSmithKline, is a prescription medicine approved for adults with chronic obstructive pulmonary disease (COPD), including chronic bronchitis, emphysema, or both.

[10] The video recording indicates that Doctor 2 entered the residence with a Medical Assistant.

98.    According to the audio recording, the Medical Assistant asked CHS again if CHS had diabetes; CHS stated, "No." Doctor 2 asked CHS if CHS had high blood pressure. CHS responded no and advised that CHS had just had CHS' blood pressure taken by an urologist. Doctor 2 asked why CHS had visited the urologist, if CHS had bladder or prostate problems. CHS responded that CHS had "four biopsies and they've all come okay." CHS advised that CHS' PSAs were high, so the biopsies were recommended.

99.    The audio recording indicates that Medical Assistant asked if CHS had any medications with the name and number of CHS' pharmacy. The video recording indicates that CHS stood and walked, unassisted, to retrieve them for the Medical Assistant.[11] CHS returned and then handed the medicines to the Medical Assistant.

100.    According to the audio recording, CHS advised Doctor 2 that, during a neck surgery, CHS' left arm suffered nerve damage due to the anesthesiologist's negligence, namely failure to palpitate the arm while CHS lay on it. Doctor 2 then asked, "Any heart problem?" CHS responded, "No." Doctor 2 said "Good." Doctor 2 asked if CHS goes to a private doctor, and CHS said, "Yeah," and advised, "I go a couple of times a year to see him." At the end of the visit, Doctor 2 shook CHS's hand saying, "Nice to meet you," and "Everything is fine." The video recording

---

[11] CHS left the sight of the recording area briefly to retrieve the medicines for approximately 23 seconds. During this time period, there was no dialogue from the Medical Assistant or Doctor 2.

indicates that CHS stood and walked, unassisted. CHS stated, "For a big old fat guy I ain't bad." Doctor 2 responded, "No. Pretty good." The video recording depicts Doctor 2 and the Medical Assistant leave the residence with CHS walking them out of the residence. According to the video recording and observations made by agents conducting surveillance, the visit lasted approximately 15 minutes.

101. Medicare claims records reflect that, during the March 2014 visit, Doctor 2 diagnosed CHS with sleep apnea. Claims were submitted to Medicare under Doctor 2's National Provider Identifier for the visit and Medicare paid Doctor 2 approximately $242.62 for services purportedly provided to CHS.

102. Medicare claims records reflect that, for the March 2014 visit, Doctor 2's NPI was used to bill CPT code 99344—new patient visit, typically 60 minutes. According to the American Medical Association's annual CPT manuals, code 99344 is to be used under the following conditions:

> Home visit for the evaluation and management of a new patient, which requires these 3 key components: A comprehensive history; A comprehensive examination; and Medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity. Typically 60 minutes are spent face-to-face with the patient and/or family.

103. Medicare claims records reflect that, for the March 2014 visit, Doctor 2's NPI was used to bill CPT code 99406. According to the American Medical Association's CPT manuals, 99406 is to be used for:

Smoking and tobacco use intermediate counseling, greater than 3 minutes up to 10 minutes.

104.    Medicare Part B claims reflect that after the March 2014 visit, Doctor 2's NPI was used to bill CPT code G0181, which as explained in paragraph 53, is used for Care Plan Oversight.  Care Plan Oversight can only be billed for a patient when the patient is receiving home health care services.  In addition, the Medicare Part A claims submitted by LINCOLN PARK reflect that Doctor 2 is the referring physician for CHS to LINCOLN PARK.

### Visit by Doctor 4

105.    On or about March 20, 2014, at approximately 11:50 a.m., CHS had another consensually audio and video recorded visit with a doctor claiming to be from HOME PHYSICIAN SERVICES.  Law enforcement identified the doctor as Doctor 4 based upon Medicare billing information submitted on Doctor 4's behalf after Doctor 4 visited CHS on May 23, 2014, as well as by comparing a Illinois Secretary of State photograph of Doctor 4 to the images of Doctor 4 on the video recording.  According to Doctor 4's Medicare Enrollment Application, Doctor 4 enrolled in Medicare in March 2014 as an independent physician.  In addition, as discussed in more detail later in this affidavit, Doctor 4 spoke to agents, confirmed that she worked at HOME PHYSICIAN SERVICES during this time period, and provided agents with documentation containing the name of the CHS.

106.    The video recording depicts CHS stand and walk unassisted towards the door when Doctor 4 arrived.  The audio recording indicates that CHS greeted

40

Doctor 4 and an unidentified Medical Assistant. CHS then reappears in the video and stands briefly unassisted while talking with Doctor 4, then CHS sat down. The audio recording indicates that Doctor 4 asked CHS if she could see all of CHS' medications. Video footage shows CHS rise and walk, unassisted to get the medications.[12] According to the audio recording, CHS advised that CHS was taking Jalyn and Advair. CHS then explained that Doctor 2 saw CHS earlier in the day; Doctor 4 advised that she could not see CHS because of this. Video footage indicates that Doctor 4 and her unidentified Medical Assistant left, and that CHS got up and walked unassisted towards the door to escort them.

### Nurse B's Visit

107. On or about March 20, 2014, at approximately 1:54 p.m., CHS placed a consensually recorded telephone call to HOME PHYSICIAN SERVICES. According to the recording, CHS called HOME PHYSICIAN SERVICES to inquire when the visiting nurse would be coming and to inform them that two physicians had come out to see CHS that day. An unidentified woman said, "Let me call the nursing agency." CHS replied, "I've got somewhere to go in a little while." The woman stated, "Yeah, I understand. Yeah, let me call them."

108. On or about March 20, 2014, at approximately 2:13 p.m., CHS had a consensually audio and video recorded visit from a nurse purporting to be employed

---

[12] CHS left the recording area to retrieve the medications for approximately 19 seconds. During this time period, Doctor 4 appeared to address a nearby dog, but said nothing else.

by LINCOLN PARK (referred to herein as Nurse B).[13] Agents identified Nurse B after observing the license plate information on the vehicle he drove to the CHS' residence. Agents used this information to identify who the vehicle was registered to. The video recording depicts CHS get up and walk unassisted towards the door when Nurse B arrived.

109. According to the recording, Nurse B started his assessment and CHS responded, "No, I'm fine, I'm fine. There was a Doctor here from your organization, [Name Redacted], this morning. And they took my temperature and blood pressure, listened to my heart and my chest. He says everything's fine." Nurse B responded, "Yeah, okay." CHS stated, "I know I'm overweight." Nurse B put on latex gloves and conducted an examination. Nurse B said, "Pulse is good," and asked, "No pace maker?" CHS responded, "No." Nurse B asked, "You don't get tired easily? Do you get tired easily?" CHS responded, "No,' and Nurse B said okay. Nurse B asked, "No chest pain?" CHS said, "No, no chest pains at all." Nurse B asked, "No dizziness?" CHS responded, "No." Nurse B asked, "Shortness of breath?" CHS responded, "Every once in a while if I'm carrying stuff up from the basement, you know, I'll get winded and stuff like that."

110. According to the recording, Nurse B advised that he would not be taking CHS's temperature or blood pressure because the doctor already did so. "I

---

[13] A search of the Illinois Department of Financial and Professional Regulation revealed that Nurse B is a licensed nurse in Illinois.

believe everything is fine," said Nurse B. Nurse B also informed CHS that CHS's pulse was "normal and stable" and that "is a good thing." Nurse B stated, "You really have no restriction which is good,' and CHS responded, "No." Nurse B asked if CHS had anything to add. CHS stated, "No, not really. It's just, you know, lookin' forward, if, you know, I can get good service from you all. But, uh, other than that."

111.   The video recording depicts CHS stay seated as Nurse B exited the residence in order to hold back one of his dogs. This visited last approximately 35 minutes.

112.   In total, LINCOLN PARK billed for two home health "episodes" or two 60 day periods, for CHS. Medicare typically approves home health care for a 60-day period of time. The first day of the initial period of home health care is known as a Start of Care. After the Start of Care, a patient must be "recertified" by a physician to receive additional 60-day cycles of home health care. These new cycles are known as "recertifications."

113.   .The initial "episode" billed for CHS occurred between March 14, 2014 to May 12, 2014 and the second episode occurred between May 13, 2014 and June 26, 2014.

114.   CHS had additional consensually recorded visits from Nurse B on or about March 27, 2014, and on three additional occasions over the initial 60-day

period (the home health "episode"). Specifically, Nurse B came to CHS's residence on April 17, 2014, May 7, 2014, and May 15, 2014.

115. On or about April 17, 2014, CHS placed a consensually recorded telephone call to Nurse B at approximately 12:45 p.m. Specifically, CHS left a voicemail on Nurse B's cell phone inquiring whether Nurse B would be visiting CHS that day. CHS said, "I've got things to do, places to go, and people to see."

### Doctor 5

116. On or about April 23, 2014, at approximately 2:36 p.m. a doctor claiming to be employed with HOME PHYSICIAN SERVICES [Doctor 5] came to the CHS's residence with an unidentified Medical Assistant. The doctor introduced himself by name upon entering the residence. According to Medicare provider enrollment information reviewed for HOME PHYSICIAN SERVICES, in approximately January 2013, Doctor 5 became an associate of HOME PHYSICIAN SERVICES and agreed to reassign his benefits to HOME PHYSICIAN SERVICES. Agents conducting surveillance observed the Medical Assistant and Doctor 5 arrive in a silver-colored vehicle bearing HOME PHYSICIAN SERVICES insignia on its sides, hood, and tail gate; the vehicle was driven by the Medical Assistant.

117. When Doctor 5 arrived at the residence, surveillance observed CHS answer the door and a small dog escape from the residence. Surveillance observed the Medical Assistant and Doctor 5 appeared to observe CHS exit the residence,

walk to the dog, bend to pick the dog up, and return to the residence carrying the animal. All of these acts were unassisted.

118. Surveillance then observed CHS escort Doctor 5 and the Medical Assistant into the residence. The video recording indicates that CHS then sat down. According to the audio recording, Doctor 5 then asked if CHS had been to the hospital lately or had any emergencies. CHS advised Doctor 5 that CHS had been to an urologist "about six weeks ago, and he did a blood test. Everything's okay." Doctor 5 confirmed that CHS was still taking Advair and Jayln; Doctor 5 confirmed that CHS had sleep apnea and COPD. Doctor 5 also confirmed that CHS was using "the [CPAP][14] machine at night?' Doctor 5 asked, "How is your breathing," and CHS responded, "Breathing's all right." CHS also advised, "No asthma."

119. According to the audio recording, CHS also advised no chest pain, no headaches and no problems urinating. CHS said that he does wake up a couple times a night to urinate. Doctor 5 then asked what pain medicines CHS was taking for pain; CHS advised Aleve. CHS advised that, "The doctor was surprised my cholesterol was so good," when asked about high cholesterol by Doctor 5. Doctor 5 said, "Okay. Very good." Doctor 5 then asked, "Do you have any pain in your knees?" CHS stated, "No," then, "Every once in a while I'll have pains in the knee but I think that's from arthritis." Doctor 5 asked about CHS' neck and back; CHS

---

[14] A CPAP machine is sometimes worn by individuals with sleep apnea during sleep. I believe that Doctor 5 was referring to a CPAP machine based upon the context of the conversation in the audio recording.

stated, "I've got spinal stenosis," then, "Every once in a while my back will go out and I'll have to head for a chiropractor." Doctor 5 then asked if CHS feels like CHS has to stop when walking around the block. CHS responded, "If I just take it easy, cause, like if I go to the grocery store or over to Walmart, I can walk there. No problem at all. And you know, walking from my car and stuff like that. That's no problem."

120. The audio recording indicates that CHS asked if Doctor 5 thought CHS needed physical therapy. Doctor 5 responded, "I saw you walk. You look okay." Doctor 5 asked, "You have some weakness of your leg, or?" The Medical Assistant asked, "Do you think you have some weakness in your legs?" CHS, indicating the right knee, stated, "Every once in a while this knee will go bad, especially like if I'm going up stairs, you know, I'll get like a pain in it and stuff." They then discussed physical therapy and CHS advised that the last time CHS had physical therapy was twelve years ago.

121. At the end of the visit, video footage indicates that CHS got up and walked unassisted to the door of CHS's residence. Surveillance observed Doctor 5 and the Medical Assistant leave the residence at approximately 2:47 p.m., driving away in the silver-colored vehicle. Doctor 5 spent approximately 11 minutes with CHS.

122. Medicare claims records reflect that, during the April 2014 visit, Doctor 5 diagnosed CHS with Osteoarthritis. Doctor 5 submitted claims to

Medicare for the visit and Medicare paid Doctor 5 approximately $208.60 for services purportedly provided to CHS.

123.    According to Medicare records, a claim was submitted to Medicare under Doctor 5's unique provider number for the April 23, 2014 visit to CHS's residence. This claim was billed under Doctor 5's name and was submitted under CPT code 99349 which, according to the American Medical Association's annual CPT manuals, is to be used under the following conditions:

> Home visit for the evaluation and management of a new patient, which requires 2 of these 3 key components: A detailed interval history; A detailed examination; and Medical decision making of high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presented problems are moderate to high severity. Typically, 40 minutes are spent face-to-face with the patient and/or family.

124.    Medicare claims records reflect that, for the April 2014 visit, Doctor 5's NPI was used to bill CPT code 99406.    According to the American Medical Association's CPT manuals, 99406 is to be used for:

> Smoking and tobacco use intermediate counseling, greater than 3 minutes up to 10 minutes.

Medicare Part B claims reflect that on April 24, 2014, Doctor 5's NPI was also used to bill CPT code G0181, which as explained in paragraph 54, is Care Plan Oversight.

## Second Visit by Doctor 4

125. On or about May 23, 2014 at approximately 5:01 p.m., CHS had a consensually audio recorded visit with Doctor 4 and an unidentified Medical Assistant.[15] Surveillance observed the Medical Assistant and Doctor 4 arrive in a silver colored vehicle bearing HOME PHYSICIAN SERVICES insignia on its sides, hood, and tail gate; the vehicle was driven by the Medical Assistant.

126. The audio recording indicates that during the visit, Doctor 4 asked CHS, "So how's everything?" CHS responded, "So far so good." Doctor 4 asked, "Any chest pain?" CHS responded, "No." Doctor 4 asked, "Shortness of breath?" CHS responded, "No. Only like if I'm carrying stuff up the basement stairs or something." Doctor 4 asked, "How's your smoking doing?" CHS responded, "Oh, I smoke a pipe, and you know, light it up and puff a couple of times and then put it down." Doctor 4 asked if CHS was having back pain; CHS responded that it comes and goes if CHS over exerts because CHS has spinal stenosis. CHS advised that when it acts up, CHS will take a couple Aleve, put liniment on it, and relax. CHS also advised that standing too long causes a tingling in CHS' legs due to the spinal stenosis.

127. According to the audio recording, Doctor 4 asked, "So what are we going to do about your weight," and advised, "You need help," then asked, "Do you need help with that?" Doctor 4 described a counseling service to help CHS lose

---

[15] Due to a technical error with the video equipment, only an audio recording was obtained. As discussed earlier, Doctor 4 was identified based in part upon Medicare billing information submitted on Doctor 4's behalf after Doctor 4 visited CHS on May 23, 2014.

weight and described potential health problems. Doctor 4 asked CHS, "When was the last time you saw urologist?" CHS advised that it was February or March and that the urologist had prescribed Jayln. CHS visited a pulmonologist in February; the pulmonologist has CHS on Advair, twice a day. Doctor 4 told CHS, "Ah, you doing well, I would say, except that weight. And you know that." CHS responded that the weight has been a problem for a while. Doctor 4 then gave CHS dietary advice. Doctor 4 asked about CHS' plans for the weekend. CHS stated, "I gotta do some planting in the garden. I bought a bunch of flowers, so."

128. Surveillance observed the Medical Assistant and Doctor 4 leave the residence at approximately 5:10 p.m. Based upon the observations made by agents conducting surveillance, Doctor 4 and the Medical Assistant spent approximately nine minutes at CHS's residence.

129. Medicare claims records reflect that, during the May 23, 2014 visit, Doctor 4 diagnosed CHS with morbid obesity. In addition, a claim was submitted to Medicare under Doctor 4's unique provider number for the May 23, 2014 visit to CHS's residence. This claim was billed under Doctor 4's name and was submitted under procedure code 99349, as explained in paragraph 123. Medicare Part B claims reflect that after the May 23, 2014 visit, on May 27, 2014, Doctor 5's NPI was also used to bill CPT code G0181, as explained in paragraph 54, Care Plan Oversight.

## Additional Visits Made by Nurse B

130.    On or about May 23, 2014, and on two additional occasions, on June 5 and June 26, 2014, CHS had consensually audio and video recorded visits with Nurse B over the second home health episode.

### CHS's Visit to Lincoln Park at Subject Premises 1

131.    On or about June 3, 2014, at approximately 11:27 a.m., CHS traveled to the offices of LINCOLN PARK (**Subject Premises 1**) at the direction of agents. CHS engaged in consensually audio and video recorded conversations with employees of LINCOLN PARK. Surveillance agents observed CHS walk unassisted into LINCOLN PARK's office suite. After entering the office, the recording indicated that the CHS spoke to a man who was later identified as Individual B.[16] Agents later identified Individual B through a search of IDES records for LINCOLN PARK. The recording indicates that CHS spoke with a woman who purported to be the scheduler for physicians, who was introduced to him by Individual B. According to the recording, Individual B introduced her to CHS by first name." Agents later identified her as Individual C through a search of IDES records for LINCOLN PARK. In the recording, CHS also spoke to a woman who purported to be the office

---

[16] Specifically, on June 25, 2014, the CHS encountered a man that the CHS identified as the same man he met on June 3, 2014. On the June 25, 2014 recording, the man identified himself by his first name.

manager, who introduced herself by first name. Agents later identified her as Individual D through a search of IDES records for LINCOLN PARK.[17]

132. According to the recording, CHS identified himself to Individual B and requested to speak to a supervisor about paper work CHS received in the mail. The recording indicates that CHS described to Individual B an instance when a physician did not come at the scheduled time, "...would have been nice 'cuz I was supposed to go out to an early dinner with a friend of mine. He was gonna pick me up."

133. According to the recording, Individual B explained to CHS where the physicians who visit CHS come from, "Oh no. Your doctors uh, your visiting doctors actually come from Home Physician Services." CHS asked, "Home Physician Services?"

134. Individual B told CHS, "The main doctor actually died. We call him [Name Redacted] for short, but his uh, full name is [Name Redacted]." CHS responded, "I think he came one time." Individual B advised, "We also use a Physician Assistants, or Nurse Practitioners." CHS responded, "Yeah." Individual B further explained, "You know they, they're like kinda like the eyes and ears of

---

[17] Agents showed CHS an Illinois Driver's license photo of Individual C and Individual D on June 5, 2014, and CHS identified these individuals as the women he met on June 3, 2014. Law enforcement showed CHS an Illinois Driver's license photo of Individual B on September 24, 2014, and CHS identified this individual as the man he met on June 3, 2014.

the, the, medical Doctor that..." CHS responded, "Right." Individual B explained, "...is in the office."

135.    According to the recording, CHS asked, "You guys been here long?" Individual B responded, "Uh, we took over uh, in August." ...CHS asked, "Who had it before?" Individual B responded, "That I'm not sure of. Only met like maybe one or two previous employees."

136.    According to the recording, Individual B introduced CHS to the physician scheduler, Individual C. CHS told Individual C, "...I was called and I said oh, the doctor will be there, I think, Tuesday between ten and noon...I think it was two weeks ago or three weeks ago. And I said no, it's gotta be afternoon, because I had an appointment with my dermatologist... I says I won't be home, make it afternoon on Thursday. Okay. I get a call Thursday, the doctor will be there between ten and noon...I says oh, I says I specifically said afternoon...Well they did change it...And I called here I think at 4:30. Doctor wasn't here yet...I mean I know she's got a two hour window. She could've called and let me know 'cuz I was supposed to go out to dinner, early dinner with a friend of mine." Individual C responded, "Oh, ok."

137.    According to the recording, Individual C stated, "Make sure that this uh, concerns of yours will be brought up to them, and then uh..." CHS asked, "What's the name of the doctors' office?" Individual C responded, "It's Home Physician Services."

138.   Agents on surveillance observed CHS walk out of **Subject Premises 1** unassisted.  This meeting lasted approximately 15 minutes and its entirety took place inside **Subject Premises 1**.

### Additional Visit Made By Nurse B

139.   On or about June 5, 2014, at approximately 1:59 p.m., Nurse B visited CHS at his residence, and CHS consensually audio and video recorded the visit. During the visit, CHS went for a brief walk outside of the residence at Nurse B's behest.   Agents conducting surveillance observed CHS walk out of the residence unassisted with Nurse B on two occasions during the visit.   During the first occasion, agents observed CHS and Nurse B walk outside for approximately two minutes. While CHS and Nurse B were outside, agents observed Nurse B receive a call on his cellular phone.   While Nurse B took the call outside, agents observed CHS walk back into the CHS' residence unassisted. After Nurse B completed the phone call, agents observed Nurse B re-enter the residence. Agents later observed Nurse B and CHS walk out of the residence and walked up and down the CHS's street for approximately four minutes. Agents then observed CHS walking without assistance from either a supporting device or Nurse B in the presence of Nurse B. This visit lasted a total of approximately 35 minutes.

### Refusal of Doctor Visit

140.   On or about June 19, 2014, at approximately 1:25 p.m., CHS received a call from HOME PHYSICIAN SERVICES.  This call was not recorded, but agents

53

monitored the call in real-time. According to agents, the purpose of the call was to schedule a physician visit. According to agents that overheard the call, CHS advised the caller that CHS had just visited his primary care physician and that the CHS's physician advised that CHS was in "tip top shape." Agents then heard CHS advise the caller that he did not want to see a doctor from HOME PHYSICIAN SERVICES.

### Second Visit to Lincoln Park at Subject Premises 1

141. On or about June 25, 2014, at approximately 11:30 a.m., CHS had a consensually audio and video recorded meeting with employees from LINCOLN PARK, at the direction of agents. Agents conducting surveillance observed CHS walk unassisted into the office of LINCOLN PARK.

142. According to the recording, upon entering the office, CHS was greeted by a man who identified himself as Individual B, who claimed to recognize CHS from CHS's last visit to the office. The recording indicates that Individual B then told CHS he would get the office manager, Individual D, to speak with him. According to the recording, CHS spoke with Individual D as well as a woman who Individual D said was the director of nursing and identified by first name [Individual E]. CHS told Individual D, "Okay. Uh, I wanna drop out." Individual D responded, "Uh, ok." CHS responded, "Because you know, uh, now that summer's here and my grandkids, I wanna go see them. So I gotta drive 35 miles either northeast, or 35 miles southwest, to go see them." Individual D responded, "Uh-

huh." In addition CHS told Individual D and Jo, "Okay and anyways, uh, you know I travel a lot and like I say I wanna go see my grandkids…" CHS also said, "My personal physician … a month ago, I went for a physical, he gave me, other than I'm overweight, he gave me a clean bill of health." CHS further indicated, "So, you know, blood test was good, urine test was good, blood pressure was 127 over 70." Individual D and Individual E both appeared to acknowledge these statements from CHS. Later in the conversation, Individual E explained, "Don't think that we're gonna tie you down at your home. No."

143.    According to the recording, CHS told Individual E and Individual D, "I got a busy schedule during the summer with the grandkids." Individual E responded, "Yes, and—and most patients do get a busy schedule because the family is off, you know, goin' on vacation and stuff." CHS responded, "Right, right." Individual D told CHS, "We know that." Individual E added, "Yeah, that's allowable. That's not you, you know. And that's doable." Individual D explained, "So we work with your schedule. We're—we're never gonna tie you down like that. No, it's not that kind of a program." CHS responded, "All right."

144.    Agents observed CHS walk unassisted out of **Subject Premises 1** unassisted. The meeting lasted approximately 8 minutes and the entire meeting took place inside **Subject Premises 1**.

### Another Visit Made By Nurse B

145. On or about June 26, 2014, at approximately 2:20 p.m., Nurse B visited CHS at CHS's home, and CHS consensually audio recorded the meeting at the direction of agents. According to the recording, Nurse B asked if CHS was getting exercise, and CHS described going grocery shopping and walking up and down the aisles. At the end of the visit, CHS advised that, "I think for the summer I'm just going to cancel everything. For now." Nurse B said, "Okay." CHS advised that when the grandkids go back to school, they could start over. Nurse B responded, "Okay."

146. At approximately 2:37 p.m., Nurse B left the residence. The visit lasted a total of approximately 17 minutes.

147. On or about July 14, 2014, LINCOLN PARK submitted to Palmetto final claims for home health services purportedly rendered to the CHS. According to Medicare claims records, LINCOLN PARK was paid approximately $4,619.94 by Medicare for home health care services rendered to CHS.

148. In total, LINCOLN PARK billed for two home health "episodes" for CHS, the initial episode being between March 14, 2014 to May 12, 2014 and the second episode occurred between May 13, 2014 and June 26, 2014.

149. In its claims, LINCOLN PARK listed the purported nurse visits and other services provided and certified that LINCOLN PARK personally provided those services. Each Medicare claim submitted by LINCOLN PARK certified that a nurse visited CHS on 15 separate occasions and listed the date of each visit. As

56

discussed below, approximately six of the claimed 15 visits never occurred. According to Medicare claims, LINCOLN PARK billed for skilled nursing visits purportedly provided on April 3, 2014, April 11, 2014, April 24, 2014, and June 12, 2014 but the CHS informed law enforcement that no visits occurred on those dates. In addition, According to Medicare claims, LINCOLN PARK billed for skilled nursing services purportedly provided on May 1, 2014 and June 19, 2014. The CHS had a scheduled visit with Nurse B for May 1, 2014 and June 19, 2014, but agents conducting surveillance determined that Nurse B never showed up to CHS's residence to provide services on those dates. Agents remained on surveillance during the scheduled time of these visits and for hours afterward, and agents did not observe Nurse B or anyone else from LINCOLN PARK come to CHS's residence.

### Interviews of Doctor 4

150.   After agents identified Doctor 4 as the individual who visited the CHS on May 23, 2014, they determined that Doctor 4 provided information to law enforcement related to other investigations at her prior employers. Specifically, Doctor 4 provided the government with information and evidence regarding health care fraud at two companies. The United States Attorney's Office has charged individuals at both companies with committing health care fraud, but Doctor 4 has

not been charged, and continues to cooperate with the government without an agreement.[18]

151. On July 14, 2014, prior to the identification of Doctor 4 as the individual who visited the CHS on May 23, 2014, she told agents that she worked at HOME PHYSICIAN SERVICES, and that HOME PHYSICIAN SERVICES schedules patients even if she determined that a patient was not homebound. Doctor 4 also told agents that there were lots of non-homebound patients at HOME PHYSICIAN SERVICES. On July 31, 2014, Doctor 4 told agents that she quit her job at HOME PHYSICIAN SERVICES on July 25, 2014.

152. On October 7, 2014, after agents identified Doctor 4 as the individual who visited the CHS on May 23, 2014, agents interviewed Doctor 4 regarding HOME PHYSICIAN SERVICES. Doctor 4 identified HENRY SMILIE—who she knew as HANK SMILIE[19]—as one of the owners of HOME PHYSICIAN SERVICES. Among other things, Doctor 4 said that in approximately May 2014, she and other employees received an email newsletter which explained the homebound requirement and lengths of times the doctor should stay when visiting a

---

[18] During a July 18, 2014 interview with law enforcement, Doctor 4 disclosed that a former employer filed a complaint against Doctor 4 with the Illinois Department of Financial and Professional Regulation (IDFPR). Doctor 4 did not elaborate on the contents of the case other than Doctor 4 wrote a statement and agreed to be seen by a therapist and to seek care.

[19] Agents have no evidence to suggest that SMILIE is a medical professional.

patient from the Medical Director of HOME PHYSICIAN SERVICES.[20]  In addition, Doctor 4 resigned from HOME PHYSICIAN SERVICES in an email because she did not want to risk her license by continuing to work there, and in response SMILIE emailed her that she did not have a contract with HOME PHYSICIAN SERVICES.

153.  Also during the October 7, 2014 interview, Doctor 4 provided agents with a printout of an email from the Medical Director of HOME PHYSICIAN SERVICES, which identified him by name and is discussed in more detail below.

154.  As discussed previously in this affidavit, consensually recorded meetings between the CHS and employees of HOME PHYSICIAN SERVICES indicate that individuals affiliated with HOME PHYSICIAN SERVICES are certifying patients as "confined to the home" in order to cause LINCOLN PARK to fraudulently bill Medicare for home health services.  In addition, Doctor 4 told agents that she raised concerns with SMILIE regarding Medicare 485 forms that were being falsified with a false diagnosis, and concluded that he did not want to know about the issue because she continued to receive 485 forms with false information.

155.  On November 3, 2014, agents conducted another interview of Doctor 4. During the interview, Doctor 4 referenced the email that she provided agents during the October 7, 2014 interview, which is from the Medical Director, and said

---

[20] Agents have identified the Medical Director of HOME PHYSICIAN SERVICES, as discussed in more detail below.

that she received weekly emails from the Medical Director during her employment at HOME PHYSICIAN SERVICES. Doctor 4 also said that she spoke to the Medical Director on two occasions. According to Doctor 4, she showed the Medical Director a document that recorded the times that she visited patients, and the Medical Director told her not to record the times. Doctor 4 provided a copy of the document to agents.

156.   The email printout provided by Doctor 4 appears to have been sent by the Medical Director. The subject line of the email is "Home Physician Services weekly updates" and the date and time of the message is "Wed, Jul 23, 2014 5:03 p.m. According to Doctor 4, the From: line on the email contains the Medical Director's name and email address. The To: line contains 13 email addresses, including the email address of Doctor 4. The CC: line includes email addresses for five HOME PHYSICIAN SERVICES employees, including owner SMILIE.

157.   The body of the email states: "Good Evening, A few updates: 1) HOMEBOUND PATIENTS: I have talked to scheduling to take patients off of schedule who are not homebound. We have had a fake patient or two in homes. So continue to pay attention. AGAIN, PLEASE DOCUMENT WHY A PATIENT IS OR IS NOT HOMEBOUND. Again you can easily find all the rules of Medicare.gov. 2) TIME SPENT IN THE HOME: Again at least 15 minutes for follow ups; again there are mock patients. 3) DOCUMENT WHAT YOU DID IN THE HOME 4) ALL OFFICE PARTY Friday August 15th, 2014 7PM; significant others welcome. 1151 N

Damen Ave Unit 3C Chicago, IL 60622. To thank all of you for your continued hard work; please just bring yourselves. Food/drink provided." The closing remark states, "Any questions please now email: [Medical Director's email account]." At the end of the message, the Medical Director's name and title is listed.

158. Agents interviewed Doctor 4 on several occasions. During one interview, Doctor 4 told agents that SMILIE showed Doctor 4 an application for a bank account to fill out.[21] SMILIE told Doctor 4 that every physician who worked for HOME PHYSICIAN SERVICES had an account. Doctor 4 recalled filling out paper work for Medicare when she began at HOME PHYSICIAN SERVICES, but Doctor 4 does not know if HOME PHYSICIAN SERVICES billed under HOME PHYSICIAN SERVICES' group number or her NPI. Doctor 4 was paid directly from HOME PHYSICIAN SERVICES not directly from Medicare.

159. Agents reviewed Doctor 4's Medicare Enrollment Application, which revealed Doctor 4 enrolled in Medicare in March 2014 as an independent physician. Doctor 4 was not enrolled to bill under the group Provider Transaction Account Number for HOME PHYSICIAN SERVICES. The paperwork lists SMILIE as a managing employee with the title Chief Executive Officer. The storage and practice locations listed are HOME PHYSICIAN SERVICES addresses, specifically **Subject**

---

[21] During an October 7, 2014 interview, Doctor 4 was asked whether earlier in the day Doctor 4 had a drink, after interviewing agents had smelled a faint scent similar to alcohol. Doctor 4 responded "no" to having a drink prior to coming to meet with agents. Doctor 4 was taken aback by the question and told agents Doctor 4 was accused of having an alcohol problem in a complaint made to IDFPR.

**Premises 2** and **Subject Premises 3**. Additionally, there is lease paperwork attached which identifies HOME PHYSICIAN SERVICES as the landlord and **Subject Premises 2** as the office space being leased to Doctor 4 by HOME PHYSICIAN SERVICES. According to the lease, Doctor 4 is to pay a monthly rent to HOME PHYSICIAN SERVICES.

### Interviews of Doctor 5

160. Once agents identified Doctor 5 as the individual who visited the CHS on April 23, 2014, they determined that Doctor 5 was an individual who was encountered by agents during investigations of a company at which Doctor 5 had worked. Agents confronted Doctor 5 and interviewed him regarding his activities at HOME PHYSICIAN SERVICES and two other companies. After he was approached by agents, Doctor 5 began to cooperate with the government.

161. Doctor 5 admitted to agents that he classified patients as confined to the home even if they were not truly confined to the home because he was concerned about the patients' health. Doctor 5 said that he acted in a manner that he observed from other physicians, and that he believed that if he followed what other physicians were doing, his actions would not be fraudulent. Doctor 5 also acknowledged that he knew most of his patients had primary care physicians even though they were receiving home health services.

162. Agents interviewed Doctor 5 on multiple occasions.[22] According to Doctor 5, as of March 2015, he no longer worked at HOME PHYSICIAN SERVICES. Agents provided a copy of the definition of "confined to the home" to Doctor 5 from the Medicare Benefit Policy Manual. After reading the definition, Doctor 5 told agents that out of the patients he saw at HOME PHYSICIAN SERVICES, less than half were truly confined to the home. However, on another occasion, Doctor 5 told agents that he believed that almost all of HOME PHYSICIAN SERVICES's patients were confined to the home.

163. Doctor 5 also told agents that "very few people are qualified" to be confined to the home based upon the definition used by CMS. However, on another occasion, Doctor 5 said that a patient could be confined to the home if the patient had osteoarthritis, joint pain, diabetes, or medical problems that needed monitoring. Agents told Doctor 5, in response, that those medical conditions on their own did not necessarily meet the definition of "confined to the home" as determined by CMS. Doctor 5 then explained that CMS's definition of "confined to the home" was "a little bit more restrictive" than the definition he used at work.

164. Doctor 5 also told agents about a dispute that he had with HOME PHYSICIAN SERVICES regarding 2014 tax obligations, which caused him to quit

---

[22] Doctor 5 is cooperating with the government, and it is the government's understanding that he is cooperating in the hope that his cooperation is considered by the United States Attorney's Office when making charging decisions and/or sentencing recommendations. No promises have been made to Doctor 5 regarding his cooperation.

HOME PHYSICAN SERVICES in March 2015. Doctor 5 told agents that he felt that SMILIE wanted Doctor 5 to declare unknown income as Doctor 5's income. Doctor 5 provided to agents an IRS Form 1099-MISC addressed to him at **Subject Premises 2**, which he received from National Government Services, a Medicare contractor, reflecting $253,047.74 in payments made to Doctor 5 in 2014. Doctor 5 also provided agents an IRS Form 1099-MISC indicating $78,680 in compensation from HOME PHYSICIAN SERVICES during 2014.

165.    Doctor 5 provided agents with an email dated February 24, 2015 that appears to have been sent to him by SMILIE. In the email, SMILIE said, "After Mobile Doctors[23] closed down [Individual G][24] and I visited our company attorney [name redacted] just to make sure we were compliant with all the rules and regulation [sic]. She stated that from our paperwork we needed to change the format of the company to be compliant with the State of Illinois who [sic] regulate the physician licenses. This change [sic] our status from a Physician Practice to a Physician Management company. Meaning [sic] we would no longer receive 1099's as a company, the physician that we were managing would. However the physicians we were managing would submit a 1099's [sic] to Home Physician Services LLC for the services that were provided to the physician. Last year you

---

[23] Mobile Doctors was a company at which SMILIE, Doctor 4, and Doctor 5 worked. The company shut down after its Chief Executive Officer was arrested by federal agents on health care fraud charges in August 2013.

[24] As discussed below, Individual G is co-owner of HOME PHYSICIAN SERVICES with SMILIE.

visited 3 days per week 10 patients per day on average most days more for a total of 1550. The average billing per patient was 147.00 for a total of $227,850.00. You receive approximately $80,000.00, about 29% of every dollar billed. Your accountant should send Home Physician Services LLC a 1099 for approximately $147,000.00 for the services we provided for your physician practice. That is our tax liability not yours for furnishing the following: Malpractice Insurance, Workman comp insurance, Marketing, Scheduling, Medical Assistant, Car, Gas, Insurance, Patients, Quality Assurance, Referrals, Billing, Answering Service. I want you to know we appreciate everything you have done and would gladly talked [sic] to your accountant or lawyer. Or feel free to contact [name redacted] our attorney. The lines of communication are always open to you. Please feel free to contact me on my cell at your convenience. Cordially, Henry Smilie."

166. Doctor 5's attorney provided agents with a letter dated March 17, 2015 on HOME PHYSICIAN SERVICES letterhead, listing **Subject Premises 3** as the address of HOME PHYSICIAN SERVICES. The letter states that Doctor 5 billed $253,047.74 to National Government Services and a total of $263,532.17 overall, and concludes that "[Doctor 5] Income per his 1099' is $78,680.00 which equates to 30% of every dollar billed. [Doctor 5] should issue Home Physician Services, LLC. A 1099 in the amount of $184,852.17." The letter is signed "Hank Smilie, CEO" and lists phone numbers for SMILIE, including a phone number labeled "Cell," as well as a homephysicianservices.com email address for SMILIE.

067b7d59aa2fc586

167.    On June 28, 2015, at the direction of agents, Doctor 5 placed a consensually recorded call to a doctor he worked with at HOME PHYSICIAN SERVICES ("Doctor 6"). During the call, among other things, Doctor 6 told Doctor 5 that he hired HOME PHYSICIAN SERVICES to do his billing. Doctor 6 also explained to Doctor 5 that in order to bill for Care Plan Oversight, you have to tell them [referring to HOME PHYSICIAN SERVICES] how much time you spent doing those things. Doctor 6 also said that if the work is not done, you shouldn't bill for it.

### The Billing Practices of HOME PHYSICIAN SERVICES

168.    Agents reviewed Medicare Part B claims for HOME PHYSICIAN SERVICES, which indicate that HOME PHYSICIAN SERVICES was paid $2,337,339.26 by Medicare from February 23, 2012 to July 15, 2014. Agents determined that starting in September 2013, HOME PHYSICIAN SERVICES drastically reduced billing CPT codes G0179 and G0180. From September 2013 to December 2013, a small portion of the rendering physicians still had a few claims for G0179 and G0180 claims. In December 2013, HOME PHYSICIAN SERVICES stopped billing for CPT codes G0179 and G0180, with the exception of one claim billed in July 2014 for G0180. According to the American Medical Association, G0179 is to be used under the following conditions:

> Physician re-certification for Medicare-covered home health services under a home health plan of care (patient not present), including contacts with home health agency and review of reports of patient status required by physicians to affirm the initial implementation of the plan of care that meets patient's needs, per re-certification period.

66

According to the American Medical Association, G0180 is to be used under the following conditions:

> Physician certification for Medicare-covered home health services under a home health plan of care (patient not present), including contacts with home health agency and review of reports of patient status required by physicians to affirm the initial implementation of the plan of care that meets patient's needs, per certification period.

169. Instead, the records reflect that HOME PHYSICIAN SERVICES billed G0181, Care Plan Oversight, which according to Medicare regulations cannot be billed unless the patient is receiving home health. The most frequently billed and highest-paid CPT code billed by HOME PHYSICIAN SERVICES was G0181, Care Plan Oversight. From February 23, 2012 to July 15, 2014, HOME PHYSICIAN SERVICES was paid $1,202,549.06 by Medicare for Care Plan Oversight.

170. According to Medicare records, in June 2014, HOME PHYSICIAN SERVICES stopped billing the patient visit codes (i.e. 99350, 99349, etc.) and continued to bill G0181, Care Plan Oversight. A further search of claims submitted by HOME PHYSICIAN SERVICES revealed that the home visit claims were being billed under each physician's NPI number rather than HOME PHYSICIAN SERVICES' NPI number. For example, Medicare claims were submitted using the NPI numbers corresponding to the physicians who visited CHS during March 2014 through May 2014. Also, Medicare claims were submitted using the NPI numbers

corresponding to the physicians who visited Patient H.G. after approximately November 2013.

171. Through examining Medicare Enrollment information for the physicians working at HOME PHYSICIAN SERVICES, agents determined that physicians signed a CMS-855R, Medicare Enrollment Application for Reassignment of Medicare Benefits form, which set up the rendering physicians to bill under the HOME PHYSICIAN SERVICES group number. During an interview of Doctor 4, she told agents that HOME PHYSICIAN SERVICES set up a HPS bank account for every physician. As described in paragraph 158, Doctor 4 signed a CMS-855-I (Medicare Enrollment Application for Physicians and Non-Physician Practitioners) form, and the services rendered by Doctor 4 were billed under Doctor 4's NPI number.

## Interviews of Individual F

172. According to Individual F, he was a former employee of HOME PHYSICIAN SERVICES. During interviews with law enforcement, Individual F told agents that he has a bachelor's degree in medicine from a foreign country and is not licensed to practice medicine in the United States. According to Individual F, he received a call from HOME PHYSICIAN SERVICES regarding an interview, and he interviewed with SMILIE and Individual G. Individual F told agents that SMILIE and Individual G identified themselves as co-owners of HOME PHYSICIAN SERVICES.

173.    According to Individual F, SMILIE and Individual G initially refused to hire him because they were looking for physicians licensed in the United States. Individual F told agents that in mid-2012, SMILIE and Individual G called him back and hired him as an independent contractor, documenting CPO activities into the electronic medical records system for HOME PHYSICIAN SERVICES.

174.    Individual F told agents that SMILIE instructed him regarding how to document CPO work. Individual F said that he reviewed patient charts in order to note any time spent with patients, and was paid $4 for each "completed CPO." According to Individual F, SMILIE completed the CPO work before Individual F was hired.

175.    Individual F provided agents with an example of how SMILIE instructed him to document CPO work for billing. According to Individual F, if a home health agency called to arrange physical therapy for a patient, this phone call would count towards the CPO. Individual F said that SMILIE stressed to him that the amount of time would need to add up to 30 minutes. Individual F told agents that SMILIE instructed him to find whatever he could in the patient file to use to document the CPO, and if he did not find enough events to total 30 minutes, to just "make it up."

176.    A federal search warrant was executed on hsmilie@comcast.net, an email address that SMILIE used to communicate with Doctor 4.[25]   The search revealed an email dated July 24, 2012 from SMILIE to Individual F regarding CPO services.  The email said:

"Hello Doc,

Sometimes I just have to get to the bottoms [sic] of things myself.  After spending several hours I believe this is one of the better outlines of CPO Care Plan Oversight [sic] I believe it will be very helpful to you.

The physician who bills for CPO must be the same physician who certified the patient for home health agency or hospice services. A qualified Non-Physician Practitioner (NPP) may provide care plan oversight if the NPP has a collaborative agreement with the physician who certified the patient. Neither the physician nor the NPP providing the service may be an employee or director, paid or voluntary, of either the home health agency or the hospice providing the care or have any significant financial arrangements with one of those organizations. Care plan oversight may only be billed by one physician in a month.

In order to bill for the service, a minimum of 30 minutes of CPO in a calendar month must be billed. When the claim form is submitted, it must be billed with the start and end date of the month, as the dates of service.

Pay attention to the services that may be included in CPO.

Here is what the CMS manual says may be included in CPO time:

*CPO services require complex or multidisciplinary care modalities involving:*
- *Regular physician development and/or revision of care plans;*
- *Review of subsequent reports of patient status;*
- *Review of related laboratory and other studies;*

---

[25] The search also revealed emails sent from hsmilie@comcast.net that included the text "Sent by my iPhone."  In my experience, that is default text used by iPhone cellular phones manufactured by Apple as a footer in emails sent from Apple phones.  Based upon those emails, I believe that SMILIE has used his cellular phone to send emails.

- *Communication with other health professionals not employed in the same practice who are involved in the patient's care;*
- *Integration of new information into the medical treatment plan; and/or*
- *Adjustment of medical therapy.*

A physician **may not** include these activities in time counted as CPO:

From the CMS manual:

*Services not countable toward the 30 minutes threshold that must be provided in order to bill for CPO include, but are not limited to:*
- *Time associated with discussions with the patient, his or her family or friends to adjust medication or treatment;*
- *Time spent by staff getting or filing charts;*
- *Travel time; and/or*
- *Physician's time spent telephoning prescriptions into the pharmacist unless the telephone conversation involves discussions of pharmaceutical therapies."*

177.  The email above was part of an email chain in which Individual F replied to SMILIE in an email dated July 25, 2012.  In the email, Individual F told SMILIE, among other things, "You might want to forward the email to [Individual H] because lot of [sic] services we document currently might not be valid for compensation.  I will make a preliminary list of services that I know for sure based on the new info you provided will be valid for compensation and email it to you for review.  I did few [sic] charts last night.  The oldest ones from the month of may [sic].  I'll appreciate [sic] it if you had time to take a look at them and write me back or call me with your feedback."

178.  Individual F gave law enforcement access to his email account, but agents could not find this email chain in Individual F's account.  Individual F told

71

agents that he did not remember deleting these email messages, and remembers receiving the email from SMILIE and replying.

179.   According to Individual F, he sent the email above to SMILIE because Individual H—an employee of HOME PHYSICIAN SERVICES who handed billing—and SMILIE disagreed on technical matters regarding how to bill for CPO and how to keep CPO billing from being rejected.  Individual F said that SMILIE and Individual H were trying to figure out the best way to bill for CPO because many CPO claims were being rejected, and SMILIE and Individual H did not know why.

180.   Individual F said that in September or October of 2012, CPO documentation was slowing down, so SMILIE asked Individual F to help HOME PHYSICIAN SERVICES employees with paperwork, and agreed to pay Individual F $21 per hour to do that work.  Individual F said that he began working in the office to help with paperwork and became informally in charge of the office.

181.   Individual F said that at some point he became uncomfortable with HOME PHYSICIAN SERVICES' CPO activity, because the physician needs to be the one who documents and performs the actual CPO activities, but HOME PHYSICIAN SERVICES physicians were not doing so.  Individual F noted that non-physicians were conducting the activities but HOME PHYSICIAN SERVICES still billed Medicare for CPO.

72

182.    Individual F also told agents that home health agency nurses called the offices of HOME PHYSICIAN SERVICES to get signed physician orders for treatment, such as physical therapy. Individual F said that he saw SMILIE using rubber stamps of physicians' signatures to create those orders. Individual F told agents that, in particular, SMILIE used a stamp for the signature of Doctor 2, who Individual F described as old and inattentive. Individual F said that he was sure that SMILIE had stamps for other physicians but he wasn't sure which ones.

183.    Individual F said that he was concerned about the use of signature stamps because they were used to sign documents with physician signatures in response to requests from home health agencies. Individual F said that physicians should have the discretion over and responsibility for those orders, but they were routed to SMILIE, who used signature stamps. Individual F told agents that he asked SMILIE if there were any concerns about violating the Health Insurance Portability and Accountability Act when using the signature stamps. According to Individual F, SMILIE replied that the stamps were acceptable because they were the physicians' idea so that they would not have to be bothered. Individual F said that he became concerned when he called HOME PHYSICIAN SERVICES physicians about some of the orders that were stamped, and they were not familiar with the orders.

184.    According to Individual F, Doctor 2 told him that SMILIE requested that electrocardiograms ("EKGs") be ordered for each new patient automatically.

73

Individual F said that when inputting the orders into the electronic medical records system, he did not see any physician orders for EKGs, indicating that the physicians did not order the tests. Individual F told agents that he brought this issue to SMILIE's attention, and SMILIE responded that the physicians must have forgotten the order, and he told Individual F to complete the order and give it to Individual H for billing.

185. Individual F told agents that he started conducting research in late 2012 due to the concerns he had regarding the practices of HOME PHYSICIAN SERVICES. According to Individual F, his research led him to believe that the practices of HOME PHYSICIAN SERVICES could be illegal, and he decided that he no longer wanted to work there. Individual F told agents that this decision was difficult because he had three children to support and he needed the income from HOME PHYSICIAN SERVICES.

186. According to Individual F, he met Individual G at a coffee shop near an office of HOME PHYSICIAN SERVICES on a Friday or Saturday in January 2013. Individual F said that he told Individual G that HOME PHYSICIAN SERVICES' practices, including the use of signature stamps, were illegal. Individual F said that Individual G suggested that Individual F meet with him and SMILIE to discuss the matter.

187. Individual F told agents that, on the Monday immediately following the meeting with Individual G, he met with SMILIE and Individual G and repeated

74

his belief that HOME PHYSICIAN SERVICES's practices, including the use of signature stamps, were illegal. Individual F said that he told SMILIE and Individual G that he no longer wanted to work in the HOME PHYSICIAN SERVICES office, but would be willing to just go back to completing CPOs at his residence. According to Individual F, in response to his request, SMILIE laughed and said that HOME PHYSICIAN SERVICES's CPO activities were also illegal. According to Individual F, he stopped working for HOME PHYSICIAN SERVICES after that meeting.

188. Individual F reported HOME PHYSICIAN SERVICES to the tip line of the Department of Health and Human Services on March 29, 2013. According to Individual F, he did not report HOME PHYSICIAN SERVICES sooner because he was worried about the safety of himself and his family because SMILIE told him and others at HOME PHYSICIAN SERVICES that he [SMILIE] previously worked for the United States Secret Service. Individual F also said that he became more motivated to report HOME PHYSICIAN SERVICES after speaking to an attorney in February 2013.

### Interview of Individual H

189. Individual H told agents that he started working at HOME PHYSICIAN SERVICES in June 2012, after interviewing with SMILIE and Individual G. According to Individual H, there was "a lot of fraud" at HOME

PHYSICIAN SERVICES, including swabbing every patient and then billing $1,000 for doing so.

190.    Individual H also told agents that SMILIE used a signature stamp bearing the name of Doctor 2, who was the Medical Director at HOME PHYSICAN SERVICES.   According to Individual H, SMILIE used Doctor 2's signature stamp without Doctor 2's consent on telephone orders and other important medical documents.   Individual H also told agents that SMILIE forged Doctor 2's signature and asked Individual H how the forgery looked.   According to Individual H, he told SMILIE that SMILIE should not forge Doctor 2's signature.

191.    Individual H said that he was aware of Medicare and CMS rules and studied them himself.   In response to a question from an agent, Individual H acknowledged that he was "quite familiar" with the methods used for billing CPO at HOME PHYSICIAN SERVICES, adding, "I knew this was coming."

192.    According to Individual H, doctors at HOME PHYSICIAN SERVICES did not perform the oversight functions billed by HOME PHYSICAN SERVICES but rather merely oversaw members of the HOME PHYSICIAN SERVICES staff who made phone calls.   Individual H said that the staff members were not licensed medical professionals—not Physician Assistants or Nurse Practitioners.   Individual H said that HOME PHYSICIAN SERVICES doctors reviewed this work when they reviewed and signed phone orders or when the staff called doctors regarding lab orders.

193.    Individual H said that there were seven or eight people in the HOME PHYSICIAN SERVICES office creating billing for CPO, but he did not think that SMILIE filled out the CPO billing forms himself.

194.    Individual H told agents that he stopped working at HOME PHYSICIAN SERVICES on approximately October 2013.

### Statements of Doctor 4 and Doctor 5 Regarding CPO Billing

195.    During the interviews of Doctor 4, she told agents that she did not sign CPO documents for HOME PHYSICIAN SERVICES's patients, and that she did not believe that her patients at HOME PHYSICIAN SERVICES needed CPO services.

196.    I reviewed Medicare claims data and found no CPO claims billed under the NPI for Doctor 4 from approximately February 2012 through approximately July 2014.

197.    I reviewed Medicare claims data from approximately January 2013 through approximately July 2014 and determined that approximately $60,000 in CPO claims were billed using the NPI for Doctor 5.  However, during interviews of Doctor 5, he told agents that he rarely performed CPO services and that, even if he did, it was not documented in the patient chart.  Doctor 5 told agents that no one at HOME PHYSICIAN SERVICES discussed CPO services with him.

198.    Medicare records indicate that on January 2, 2013, HOME PHYSICIAN SERVICES submitted a claim that $120 in care plan oversight services were provided by Doctor 5.  As discussed above, Individual F told agents

that he met with SMILIE and Individual G on a Friday or Saturday in January 2013. According to Individual F, during that meeting, SMILIE told him that HOME PHYSICIAN SERVICES's CPO activities were illegal.

### Status of HOME PHYSICIAN SERVICES's Medicare Enrollment

199. As of at least November 24, 2014, HOME PHYSICIAN SERVICES is no longer enrolled in Medicare, based upon Medicare enrollment information that I reviewed on August 3, 2015 and was obtained on or around March 3, 2015. The information also lists **Subject Premises 2** and **Subject Premises 3** as practice locations for HOME PHYSICIAN SERVICES LLC. In addition, the enrollment information does not list the usage of any other facility for medical record storage.

200. As discussed above, Doctor 4 told agents that SMILIE said that HOME PHYSICIAN SERVICES would set up a bank account for her that HOME PHYSICIAN SERVICES would manage, and that Medicare payments would go into that account. In addition, as discussed above, the NPI for Doctor 4 was used to bill Medicare for Doctor 4's May 23, 2014 visit to the CHS. Based this and other evidence, including the correspondence between SMILIE and Doctor 5 in 2015, I believe that HOME PHYSICIAN SERVICES uses the NPI of physicians to bill Medicare and has continued to do so after November 24, 2014.

201. On July 24, 2015, the CHS made an unrecorded and unmonitored phone call to a phone number included on a promotional item from HOME PHYSICIAN SERVICES given to him on March 20, 2014 by Doctor 2. According to

the CHS, during the call, the individual he spoke to said that HOME PHYSICIAN SERVICES was still located at **Subject Premises 3**.

202. On July 24, 2015, an agent conducted surveillance at **Subject Premises 2** and **Subject Premises 3** and observed HOME PHYSICIAN SERVICES signage at both locations.

203. On August 3, 2015, I visited the website of HOME PHYSICIAN SERVICES, which lists **Subject Premises 2** and **Subject Premises 3** as business locations of HOME PHYSICIAN SERVICES.

### Additional Evidence Regarding the Subject Premises

204. Cahaba provided agents additional Medicare claims for physicians whose billing was connected to **Subject Premises 2**. The CPT codes primarily billed under each of the physicians' NPIs were home visits with new patients (CPT codes 99341 through 99345); home visits with established patients (CPT codes 99347 through 99350); G0181 Care Plan Oversight; and physician certification and recertification for Medicare covered home health services (CPT codes G0180 and G0179). In addition, Cahaba provided agents Medicare Provider Enrollment information for these physicians. The provider enrollments listed the practice location as **Subject Premises 2** and the "Managing Employee" as SMILIE.

205. Based upon agents' review of records that agents obtained from Cahaba, HOME PHYSICIAN SERVICES and LINCOLN PARK submit claims to Medicare electronically. Based on my training and experience, I am aware that

before a provider may submit Medicare claims electronically, it must execute an agreement with Medicare. This agreement is the EDI Agreement or Electronic Data Interchange Form. As part of that agreement, the provider agrees to various provisions for submitting Medicare claims electronically to CMS. For example, one provision is that the provider is required to maintain the original medical records and other documentation relating to paid claims for a period of six years and three months after the claims are paid. Another provision is that the provider acknowledges that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to an EDI Agreement may, upon conviction, be subject to a penalty under applicable Federal law.

206. Based on my training and experience, I know that Medicare providers are given procedure code manuals, billing manuals, and service bulletins describing proper billing procedures and regulations. It is made clear in these materials that they can only submit claims for services rendered, and that they must maintain patient records, such as patient files, to verify the services were provided for a period of at least six years.

207. I am also aware that home health care and visiting physicians' offices such as LINCOLN PARK and HOME PHYSICIAN SERVICES generally keep Medicare and insurance manuals, documents, contracts, bulletins, and instructions.

These manuals and records provide information relating to the proper procedures for submitting Medicare and insurance.

208.   Based on my training and experience investigating health care fraud cases, I am also aware that home health care providers and visiting physician offices such as LINCOLN PARK and HOME PHYSICIAN SERVICES generally maintain records of internal communications with their employees, such as policy memoranda, procedures and directions for processing and submitting claims to Medicare and/or insurance companies, procedures and directions for conducting patient assessments, and internal communications relating to the processing and handling of claims for reimbursement for specific patients.

209.   I am also aware that providers such as LINCOLN PARK and HOME PHYSICIAN SERVICES generally maintain Medicare and insurance billing/payment records, including remittance advices and claims for services provided.

210.   I am also aware that providers such as LINCOLN PARK and HOME PHYSICIAN SERVICES generally maintain records showing their employees' knowledge of the proper procedures for submitting Medicare and insurance claims, such as documentation and/or information relating to licenses, accreditations, training, and records relating to seminars attended, such as certificates of attendance/completion, agendas, course schedules, and training materials.

81

211.   I am also aware that providers such as LINCOLN PARK and HOME PHYSICIAN SERVICES generally maintain documents relating to their finances, including payments received from Medicare and insurance companies, such as bank account records, money market account records, loan records, credit card statements, accounting records, such as balance sheets, profit and loss statements, accounts receivable and accounts payable ledgers, sales journals, and copies of tax returns.

212.   Based on my experience in investigating Medicare cases, I am aware that many home health care companies keep ledgers of cash kickbacks paid to doctors and other health care professionals in exchange for the referral of Medicare patients.

213.   Based on my training and experience, I am aware that medical companies generally use computers and other forms of electronic media to enter and store health care data, including claims information, physician/marketer information, patient records, Medicare bulletin and educational articles, patient logs, employee rosters, payroll information, calendars, business procedures, and billing/payment records.

**SPECIFICS REGARDING SEARCHES OF COMPUTER SYSTEMS**

214.   Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy

information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

     a.     Computer storage devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

     b.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or

normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

215. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

216. In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## PROCEDURES TO BE FOLLOWED IN SEARCHING COMPUTERS

217. The warrant sought by this Application does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

218. With respect to the search of any computers or electronic storage devices seized from the location identified in Attachment A hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may

84

use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

      a.     examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

      b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

      c.     surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

      d.     opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

      e.     scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

f. performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

219. Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, or unless otherwise ordered by the Court.

## CONCLUSION

220. Based on the above information, I respectfully submit that there is probable cause to believe that beginning no later than July 2012 and continuing until at least May 27, 2014, HENRY SMILIE did knowingly and willfully participate in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain, by means of false and fraudulent representations, money under the control of Medicare in connection with the delivery of or payment for health care services, and, in execution of the scheme, on or about January 2, 2013, did knowingly cause to be submitted a false claim, specifically, a claim that care plan oversight services were provided even though services provided did not qualify for payment by a federal health care medical benefit program, in violation of Title 18, United States Code, Section 1347.

221. I further submit that there is probable cause to believe that health care fraud offenses, in violation of Title 18, United States Code, Sections 1347, have been committed, and that evidence and instrumentalities relating to this criminal

86

conduct, as further described in Attachment B, will be found in the **Subject Premises**, as further described in Attachment A.

222.   I therefore respectfully request that this Court issue a search warrant for the **Subject Premises**, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

_____
Raul A. Sese
Special Agent
U.S. Department of Health
and Human Services

Subscribed and sworn
before me this 5th day of August, 2015

_____
Honorable DANIEL G. MARTIN
United States Magistrate Judge

87